[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 12-15660 & 13-12009
_____

D.C. Docket No. 8:10-cr-00550-EAK-MAP-6


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

GEORGE R. CAVALLO,
PAULA L. HORNBERGER,
JOEL A. STREINZ.

Defendants - Appellants.


_____

Appeals from the United States District Court
for the Middle District of Florida
_____


(June 22, 2015)

Before TJOFLAT and JULIE CARNES, Circuit Judges, and DUBOSE[*], District
Judge.

_____

[*] Honorable Kristi K. DuBose, United States District Judge for the Southern District of
Alabama, sitting by designation.

JULIE CARNES, Circuit Judge:

The defendants in this case—George Cavallo, his wife Paula Hornberger, and Joel Streinz—were players in one of the most long-lasting mortgage fraud conspiracies in the history of central Florida. From approximately October 1997 through March 2008, these three defendants, along with about a dozen other people, conspired to solicit and assist friends, family members, and business associates to fraudulently purchase and sell over thirty residential real estate properties that were ultimately used as primary residences or for investment purposes.

Fifteen of the defendants' cohorts pled guilty either to the conspiracy count or to at least one substantive count. Only Cavallo, Hornberger, and Streinz went to trial,[1] and, after a three-month trial, the jury convicted each of them on the count charging conspiracy to commit wire fraud and to make false statements to an FDIC-insured bank in violation of 18 U.S.C. § 371. Cavallo and Hornberger were also convicted of one substantive count of making false statements to an FDIC-insured bank in violation of 18 U.S.C. § 1014.

Cavallo was sentenced to 120-months imprisonment. Hornberger was sentenced to twelve months and one day imprisonment. Both were ordered to pay

---

[1] Richard Bobka pled guilty shortly after the trial had begun.

over $13 million in restitution.  Streinz was sentenced to 60-months imprisonment and ordered to pay $2,322,676 in restitution.  All three appeal their convictions.  Cavallo and Hornberger also appeal their sentences.  After careful consideration of the record and all the briefs, we affirm Cavallo's and Hornberger's convictions and sentences, except that we vacate and remand the orders of restitution issued as to them.  We reverse and vacate Streinz's conviction.

## I.  BACKGROUND

The leader of the conspiracy, Craig Adams, devised and led the fraud scheme, which was referred to at trial as "Craigonomics."  The conspirators would fraudulently obtain the maximum amount of possible loans for each property by using false statements on mortgage applications, allowing the conspirators to minimize the funds needed for closing.  The parties would then sell, or "flip," the properties to turn a profit.  To accomplish this objective, the conspirators would falsely inflate the sale price of properties in the loan documents they submitted to lenders and then resell the properties either among themselves, as "friendly" buyers and sellers, or to others outside the conspiracy.  To further reduce the amount of money needed for closing, the conspirators sometimes obtained second mortgages from different lenders without disclosing the first mortgage.

The loan applications contained material falsehoods concerning:  (1) the purchaser's and/or buyer's income, assets, and liabilities; (2) the purchase or sale price; (3) the amount and source of the down-payment; (4) the identity of the seller and purchaser/borrower; (5) the familial relationship of the parties; (6) the purchaser's/borrower's intended use of the property; and (7) the disbursement of the loan proceeds.  Some conspirators lived in the fraudulently-acquired homes, but because most could not afford the mortgage payments and maintenance costs of the properties, they rented out the homes for additional income.  Even then, the borrowers experienced cash flow problems, and they often took out home equity loans on their existing properties or acquired new properties and fraudulently extracted cash from them.

The leader of the scheme, Craig Adams, initiated and orchestrated the conspiracy by locating properties and recruiting individuals to participate.  Adams, who pled guilty, recruited Richard Bobka, who is defendant Cavallo's brother, to act as a real estate agent, buyer, and seller.  Bobka then partnered with Cavallo and Cavallo's wife, defendant Hornberger, to fraudulently obtain more properties.  On several occasions, Hornberger served as a friendly buyer because she had a good credit score.  Cavallo handled the bookkeeping, banking, and taxes for many properties that he and Hornberger acquired with Bobka.  Cavallo and Hornberger

4

listed several of the fraudulently-acquired properties on their joint tax returns by claiming rental income and expenses. Cavallo, Bobka, and Hornberger maintained a joint bank account that they used to hold the fraudulently-acquired loans. Bobka also recruited defendant Joel Streinz to participate in the conspiracy as a friendly buyer and seller for two properties.

On appeal, the three defendants before us raise several issues. Streinz argues that the district court violated his Sixth Amendment right to counsel when the court prohibited him from consulting with his attorney during the time period in which he was testifying: a period that covered three days of trial and two overnight recesses. Cavallo argues (1) that there was insufficient evidence to convict him of making false statements to an FDIC-insured bank in violation of 18 U.S.C. § 1014 and (2) that his sentence is substantively and procedurally unreasonable. Cavallo and Hornberger, together, argue that the district court erred in (1) ordering and calculating restitution and (2) using sidebar conferences in violation of their Sixth Amendment right to a public trial. Finally, all three defendants argue that the district court erred by: (1) failing to fully investigate possible juror misconduct; (2) failing to conduct an evidentiary hearing on allegations of witness misconduct in grand jury; and (3) failing to conduct an evidentiary hearing on alleged defense witness intimidation. We address first any

5

contentions that challenge the validity of a conviction, after which we turn to challenges to the sentences imposed.

## II.  STREINZ'S ACCESS TO COUNSEL CLAIM

### A.    Background

After his co-defendants had rested their cases, Streinz informed the court that he wanted to testify on his own behalf.  That testimony was delayed, however, because on the morning that Streinz's testimony was scheduled to begin, Government counsel informed the trial court that Streinz had just produced documents that were pertinent to his testimony and that should have been provided much earlier, during discovery.  The district court convened a hearing, and Streinz testified that he had recently found the documents at home, while preparing for trial.  At the Government's request, the court ordered Streinz, his attorney, the prosecutor, and a federal agent to go to Streinz's house to retrieve any other documents that were subject to discovery.  The court recessed the proceedings, postponing Streinz's testimony and directing him "not to communicate with anyone whatsoever with regard to the documents located at your home."

Accompanied by the prosecutor, a detective, a federal agent, and his own attorney, Streinz traveled to his home.  Upon entering the house, the group went directly to an office that contained stacks of papers that Streinz had been

6

examining in preparation for trial. The situation became heated, with Streinz asserting that the officers were engaging in a more intrusive search than was appropriate for their limited mission, and with the detective, who contended that Streinz was not complying with the officer's directives, ultimately calling for backup. To prevent matters from getting further out of hand, Streinz's attorney quickly tried to identify any pertinent documents and brought those documents to the courtroom, where the prosecutor began reviewing them. While examining these papers, the prosecutor saw a handwritten notation indicating that the documents contained Streinz's work product. Concerned that he might be improperly examining a defendant's work product, the prosecutor ceased his review and asked Streinz's attorney to keep the documents in a box in the courtroom in case an issue arose.

Streinz's attorney moved for a mistrial the next morning, arguing that his defense had been compromised by the document retrieval and review procedure. The court denied the motion and asked Streinz if he still wanted to testify. Streinz indicated that he did, although he expressed concern that his defense had been "jeopardized" by the previous day's events. Streinz's direct examination then began. As the trial recessed at the end of the day, the court instructed Streinz that he could not discuss his testimony with "anyone," but that he could talk to his

lawyer about his "constitutional rights." The court did not, however, explain what that phrase might mean.

Prior to resuming his direct testimony the next day, Streinz sent a letter directly to the court expressing distress at his situation. As set out in that document, Streinz noted uncertainty whether it was appropriate to send the judge a letter, but, given the court's earlier restriction on conversations with his attorney, he felt that he could not talk with the latter about his concerns without "cross[ing] a line of violating the court[']s] restrictions." Streinz stated, among other things, that his preparation, particularly for cross-examination, had been hampered because he had been deprived of trial documents that were "seized without any advance notice," thereby preventing him from being able to inventory or make copies of the documents.

The court acknowledged Streinz's letter and, while the other trial participants remained waiting in the courtroom, allowed Streinz, on his own and without any consultation with his attorney, to review the documents taken from his home. After he had finished reviewing the documents in the courtroom, Streinz completed his direct examination, and cross-examination began. Streinz was still on the stand being cross-examined when the trial day ended. The district court again reminded him that, although he could talk to his lawyer about "constitutional

8

rights" during the overnight recess, he could not talk to his lawyer "about the case." Again, the court did not explain what a discussion about Streinz's constitutional rights might entail.

The next morning, Streinz sent a second letter to the court. In this letter, Streinz expressed his anxiety that, because the court would not allow him talk to his lawyer, no one was "looking out" for his "interests and due process." He also advised the court that the time he had been given to review his documents in court on the previous day was insufficient, considering that he had been deprived of the documents for three days. In particular, he noted, the Government had referenced one of those documents in court the day before and likely would do so again, and Streinz had no access to that document to better prepare himself for cross-examination. He concluded by suggesting that errors made by the Government, his attorney, and the court were "sabotaging [his] ability to be prepared and properly defend [his] case."

The district court acknowledged Streinz's complaint but indicated that the documents had been available to Streinz ever since his attorney, in the company of Government personnel, had retrieved them from Streinz's home. (But as Streinz was not supposed to be talking to his attorney about the case, it is unclear how Streinz would have known that he could have requested his lawyer to hand over

9

the documents to him.)  Regarding the impact of any errors on Streinz's right to testify, the court reminded Streinz that it had previously informed him that he had a constitutional right not to testify.  Then, after giving Streinz forty additional minutes to review the documents in the courtroom, cross-examination began again.

## B.    Discussion

Streinz argues that his Sixth Amendment rights were violated by the trial court's refusal to allow him to confer with counsel during the two overnight recesses while he was testifying.  We agree.

We review Streinz's Sixth Amendment claim pursuant to a *de novo* standard.  *See United States v. Williams*, 527 F.3d 1235, 1239 (11th Cir. 2008) (reiterating that claims of constitutional error are reviewed *de novo*).  A trial is deemed unfair if the accused is denied counsel at a critical stage of his trial.  *See United States v. Cronic*, 466 U.S. 648, 659 (1984).  The question here is whether, by prohibiting Streinz from speaking to his attorney about his case during the three days he was on the witness stand—including the two overnight recesses—the district court deprived Streinz of assistance of counsel at a critical stage of the proceedings.  We conclude that the district court's restriction did so deprive Streinz.

10

This conclusion is dictated, for the most part, by the Supreme Court's decision in *Geders v. United States*, 425 U.S. 80, 91 (1976). In *Geders*, which was also tried in the Middle District of Florida, the district court had directed defendant Geders not to talk to his attorney "about anything"[2] during a seventeen-hour overnight recess between his direct and cross-examination. *Id.* at 83 n.1. Geders' attorney objected, explaining that he had a right to talk to his client about matters other than the imminent cross-examination. The district court declined counsel's request, noting that the latter could talk to Geders, while remaining in the courtroom, about the witnesses to be called the next day, but nothing more than that. Further, the court assured counsel that he would be able to consult with Geders once the latter's cross-examination had concluded and before redirect examination, and the court did allow that post-cross-examination consultation the next day. *Id*. at 82–85.

In determining whether the district court's sequestration of Geders from his own attorney during the overnight recess violated Geders' constitutional right to counsel, the Supreme Court acknowledged that, as a general rule, valid reasons

---

[2] In directly addressing defendant Geders at the conclusion of the colloquy on this matter, the district court stated: "[Mr. Geders] . . . I direct you *not to discuss your testimony* in this case *with anyone* until you are back here tomorrow morning . . . for the purpose of being cross-examined." *Geders*, 425 U.S. at 83 n.1 (emphasis added). Based on its review of the totality of the discussion and the court's earlier statements, the Supreme Court concluded that the actual message communicated to the defendant was that he was not to talk to his attorney about anything. *Id.* ("The ambiguity of this colloquy appears to be resolved by the direction that petitioner 'not talk to you (counsel) about anything.'").

11

exist for disallowing a witness who is testifying from speaking to trial counsel at recess periods during that testimony. The main justification for this prohibition is the interest in deflecting efforts by third-parties to coach the witness before he returns to the stand the next day to face cross-examination. *Id*. at 87. Yet, as the Court noted, a criminal defendant is not just another witness. Although a non-party witness will likely have little to discuss with trial counsel other than his upcoming testimony, an accused and his attorney will often have many other matters to discuss during an overnight recess. Indeed, the Court noted, "[s]uch recesses are often times of intensive work, with tactical decisions to be made and strategies to be reviewed." *Id.* at 88. For example, defense counsel "may need to obtain from his client information made relevant by the day's testimony, or he may need to pursue inquiry along lines not fully explored earlier. At the very least, the overnight recess during trial gives the defendant a chance to discuss with counsel the significance of the day's events." *Id.*

Although it was sympathetic to a district court's desire to minimize the opportunities for a witness to be coached during a long recess, the Supreme Court nonetheless determined that an accused's right to confer with counsel trumps a court's concerns about such consultation. Specifically, when there is a conflict between a testifying defendant's right to consult with his attorney during "a long

12

overnight recess" and the prosecutor's desire to eliminate the risk that defense counsel will coach his client before the latter's cross-examination, "the conflict must, under the Sixth Amendment, be resolved in favor of the right to the assistance and guidance of counsel." *Id*. at 91.

Geders' conviction was overturned because the trial court would not let him talk to his lawyer during *one* overnight recess. The district court here, in effect, restricted Streinz from talking to his attorney during *two* overnight recesses that occurred while he was testifying.[3] Thus, on its face, *Geders* appears to call for reversal of Streinz's conviction. The Government, however, disagrees that *Geders* requires a conclusion that Streinz's right to counsel was violated, and we now turn to those distinctions that the Government says exist between this case and *Geders*.

First, the Government cites language, here and there, from *Perry v. Leeke*, 488 U.S. 272 (1989), in support of its argument that Streinz's right to counsel was not compromised by the district court's broad embargo on conversations between Streinz and his attorney. But it is difficult to discern how *Perry* bolsters the Government's position. In *Perry*, the trial court had only prohibited the defendant from consulting with his attorney during a fifteen-minute recess that occurred after

---

[3] As noted, on the first night, while Streinz was still testifying on direct, the court told him that he could not discuss his testimony with "anyone," but that he could talk to his lawyer about his "constitutional rights." On the second night, the district court reminded Streinz that he could not talk to his lawyer "about the case," although he could talk to his lawyer about his "constitutional rights."

the defendant's direct testimony had concluded and before cross-examination was to begin. *Id.* at 280. Given the timing and short duration of the recess, the Supreme Court distinguished *Geders* and concluded that the defendant's right to assistance of counsel had not been compromised by sequestration from his attorney during such a brief period of time.

In reaching this conclusion, the Court noted that a defendant has no constitutional right to consult with his lawyer while testifying. *Id*. at 281. In other words, if a defendant gets in a tight spot on cross-examination, "neither he nor his lawyer has a right to have the testimony interrupted in order to give him the benefit of counsel's advice." *Id*. Were a defendant allowed to huddle with his lawyer whenever the going gets tough, the truth-seeking function of the trial would be impeded.[4] And if a defendant has no right to call a time-out to talk with counsel during his testimony, he similarly has no right to take advantage of a fortuitously-timed recess "in which there is a virtual certainty that any conversation between the witness and the lawyer would relate to the ongoing testimony."[5] *Id*. at 283–84.

---

[4] This is so not so much because of the fear of unethical coaching by counsel, but because consultation with counsel "grants the witness an opportunity to regroup and regain a poise and sense of strategy that the unaided witness would not possess. . . . [T]he discovery of truth [is less likely when] a witness [] is given time to pause and consult with his attorney." *Perry*, 488 U.S. at 282.

[5] It should be noted, though, that the Supreme Court made clear that it was not criticizing judges who do permit criminal defendants to consult with counsel during a short trial recess. The Court merely held that "the Federal Constitution does not compel every trial judge to allow

14

But, in terms of the right to assistance of counsel, a period of silence between a criminal defendant and his attorney during a short recess was a far different matter for the *Perry* court than would be a similar quarantine during an overnight recess. Reaffirming *Geders*, the Court noted that during an overnight recess, normal consultation between defendant and counsel would "encompass matters that go beyond the content of the defendant's own testimony," including the availability of other witnesses, trial tactics, or even negotiating a plea agreement. *Id.* at 284. And the "fact that such discussions will inevitably include some consideration of the defendant's ongoing testimony does not compromise that basic right." *Id.*

In short, we read *Perry* as reaffirming the validity of the *Geders* principle. The district court's restriction on Streinz's ability to consult with his attorney during two overnight recesses clearly "falls on the *Geders* side of the line and violates the Sixth Amendment." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 651 (9th Cir. 2006) (holding that *Geders* precludes "any overnight ban on communication"); *see also Perry*, 488 U.S. at 284 ("It is the defendant's right to unrestricted access to his lawyer for advice on a variety of trial-related matters that is controlling in the context of a long recess.").

---

the defendant to consult with his lawyer while his testimony is in progress" just because a short recess has been called. *Id*. at 284–85.

In fact, this case involves the kind of communications that *Geders* intended to protect. The day before Streinz began his direct examination, the Government had taken documents and work product from Streinz's house that he needed to prepare for his testimony. Thereafter, and throughout his direct and cross-examination, Streinz's access to the documents was limited to brief, in-court review sessions. As both Streinz and his attorney interpreted the court's instruction, Streinz could not confer with his attorney even to determine whether or how he could regain possession of the documents. Nor could he discuss with his attorney the likelihood that his defense had been compromised by the Government's retrieval and review process, or any means to reduce that threat. *See Geders*, 425 U.S. at 88 ("At the very least, the overnight recess during trial gives the defendant a chance to discuss with counsel the significance of the day's events. . . . [T]he role of counsel is important precisely because ordinarily a defendant is ill-equipped to understand and deal with the trial process without a lawyer's guidance.").

The Government argues that the district court did not actually prevent Streinz from conferring with counsel during overnight recesses, or even during in-court recesses, because the court told Streinz several times that he could discuss with his lawyer his "constitutional rights." We do not know what the district court

16

meant by this exemption, and it appears obvious that neither did Streinz.  Clearly,

Streinz was of the impression that the court had forbidden him from consulting at

all with his attorney about his case, which was not an unreasonable assumption

because those were the court's exact words.  Otherwise, he would not have felt

compelled, during the course of his testimony, to write the court two letters

revealing his concerns, and particularly his need for access to documents that the

Government had taken from his home on the day his direct examination was to

have begun.  Indeed, Streinz told the judge, outright, that he had written the letter

rather than dealing through counsel because he did not want to run afoul of the

court's order against communications between him and his attorney.

As to what one could reasonably assume the district court to have meant by

the phrase "constitutional rights," when the court told Streinz not to speak to his

attorney about anything except those rights, the court had previously and

consistently used this term to refer to Streinz's Fifth Amendment right against self-

incrimination.[6]  But any discussion about Streinz's right against self-incrimination

---

[6] On the day that Government counsel complained that Streinz had not turned over all discovery, which was prior to Streinz's direct examination, Streinz gave a sworn "proffer" outside of the jury's presence as to this matter.  Before that proffer, the district court inquired whether it was his intention to waive his "constitutional rights, not exercise [his] Fifth Amendment rights and to testify."  Afterward, the district court reminded Streinz that just because he had waived his constitutional rights by giving a testimonial proffer, he could rescind that waiver and "exercise his constitutional right" not to testify before the jury.  Just prior to this exchange, at a sidebar conference, the court had advised defense counsel that Streinz's constitutional rights were at stake once he took the stand.

17

would have been a very short conversation because Streinz had already begun testifying, and any right he might have earlier had not to incriminate himself had, by that time, become a moot point.

And even if we assume that the district court intended to permit communication on a broader array of subjects than just Streinz's right against self-incrimination, its instruction that Streinz should not talk to his attorney about "the case" during an overnight recess did not comply with *Geders. See Perry*, 488 U.S. at 284 (noting the wide variety of trial-related communications that are protected by *Geders* and stating that the "fact that such discussions will inevitably include some consideration of the defendant's ongoing testimony does not compromise" a defendant's right to assistance of counsel during an overnight recess).

Finally, citing *Crutchfield v. Wainwright*, 803 F.2d 1103 (11th Cir. 1986) (en banc), the Government makes a two-fold argument (1) that Streinz failed to preserve this issue on appeal because he did not object to the district court's

---

On the next day, right before Streinz took the stand to testify before the jury, the court stated: "Now, this will be the third time I believe that I have advised you of your constitutional rights. You have a Fifth Amendment constitutional right against self-incrimination . . . . Now, since the last time that I advised you of your constitutional rights have you had . . . an opportunity to counsel with your attorney with regard to whether or not you should testify?"

After Streinz's second letter, the court responded to his complaint that his ability to defend his case had been sabotaged by stating: "Sir, I told you before you had a constitutional right to testify or not to testify."

18

restriction and (2) that there is no indication that Streinz actually wanted to talk to his attorney during the overnight recesses. In *Crutchfield*, the state trial court called a brief recess during defendant Crutchfield's direct testimony and instructed defense counsel not to discuss the defendant's testimony with him during that break. Crutchfield did not object. *Id*. at 1104. After conviction, and relying on *Geders*, Crutchfield filed a federal habeas corpus petition, arguing that the trial court's restriction on his communication with his attorney deprived him of the assistance of counsel.

The *en banc* court unanimously agreed that the conviction should not be vacated, but three opinions were issued, with each opinion reflecting different reasoning in support of this outcome. A six-judge plurality of the *en banc* court concluded that *Geders* applied even to short recesses within a trial day and assumed that the trial court's admonition to Crutchfield did unconstitutionally restrict his right to the assistance of counsel during that recess. *Id*. at 1104–1111. But in *Geders*, the defendant had objected to the proscription against consultation. Crutchfield neither objected to the court's instruction nor did the record reflect that there was a desire to consult by either him or his counsel. Accordingly, because a defendant must show that the prohibition against consultation actually prevented

19

him from conferring with counsel, the plurality concluded that Crutchfield had failed to show a deprivation of his right to assistance of counsel. *Id*. at 1109–11.

The five-judge concurring opinion read the plurality opinion as establishing a *per se* rule that any restriction by the trial court on the ability to confer with counsel during any recess, no matter how short in duration, constitutes a deprivation of counsel. *Id*. at 1116. Viewing that analysis as too simplistic, the concurring opinion indicated that when dealing with a non-overnight recess, one should look at several factors. And given the relatively short recess and the limited admonition by the trial court, the concurring opinion concluded that Crutchfield had not suffered a constitutional deprivation of the right to counsel. *Id.* at 1115–16. Further, the concurring opinion not only disagreed with the plurality opinion's application of a *per se* rule to the question whether an error had occurred, but also found fault with the latter's application of a *per se* rule requiring a contemporaneous objection to preserve that error for review. *Id*. at 1118. The concurring opinion noted that the plurality's rule would mean that a trial court could prevent a defendant from speaking to counsel during a week-long recess— which under *Geders* would clearly constitute a constitutional error—but if no objection were made, the error would not be deemed preserved:  a result that the

20

concurring opinion concluded would not be consistent, in all cases, with established principles concerning the waiver of constitutional rights.[7] *Id.*

As noted, two years after this Court's decision in *Crutchfield*, the Supreme Court issued its decision in *Perry*, concluding that a trial court's restriction of consultation between a testifying defendant and his counsel during a brief recess does not constitute a deprivation of the defendant's right to counsel. Thus, that part of the *Crutchfield* plurality decision holding invalid even a brief restriction of consultation between a defendant and his attorney is no longer good law. As to the plurality's requirement that a contemporaneous objection be lodged to preserve error when such restrictions on consultations are imposed by a trial court, we need not decide whether such an objection would be required in all circumstances because we conclude that Streinz did object to the district court's imposition of a restriction on his right to consult with counsel and that the prohibition against consultation actually prevented Streinz from conferring with his attorney.

Here, although Streinz's two letters to the district court did not contain the phrase, "I object," he clearly conveyed the distress and confusion that the court's restrictions were causing him. *See United States v. Johnson*, 267 F.3d 376, 380

---

[7] The third opinion in the case, authored by a single judge, disagreed with the plurality opinion's announcement of a *per se* rule as to the existence of error in this context and further concluded that a defendant should be required to show prejudice if error did occur. *Id.* at 1118–21.

21

(5th Cir. 2001) (holding that, after the district court prohibited counsel from consulting with the defendant during two overnight recesses occurring while the defendant was testifying, counsel "made clear his desire to confer with [the defendant]," and was not required to "preface his remarks with the magic words, 'I object.'"); *United States v. Isom*, 88 F.3d 920, 923 n.7 (11th Cir. 1996) (explaining that although appellants did not use the words "double jeopardy" in their objection below, the substance of their argument was sufficient to preserve a claim under the Double Jeopardy Clause); *see also United States v. Munoz*, 430 F.3d 1357, 1374 (11th Cir. 2005) (agreeing that a defendant may preserve a constitutional objection "in a number of ways, and need not object explicitly on constitutional or Sixth Amendment grounds").

Streinz's two letters and his colloquies with the trial court adequately conveyed his request to confer with counsel and his belief that his rights were being violated as a result of the court's refusal to allow him to do so. He therefore alerted the court to the problem and gave it an opportunity to correct any error. *See United States v. Turner*, 474 F.3d 1265, 1276 (11th Cir. 2007) (noting that one of the "fundamental purposes" of the contemporaneous objection rule is to give the trial court an opportunity to address and avoid errors). The district court failed to do so and we therefore conclude that the trial court's orders prohibiting him from

22

conferring with counsel during two overnight recesses impermissibly infringed on Streinz's fundamental right to counsel. *Geders*, 425 U.S. at 91; *see also Perry*, 488 U.S. at 284 (reaffirming that *Geders* controls in the context of a long recess). For this reason, we **REVERSE** Streinz's conviction and remand for a new trial.[8]

### III.  ALLEGED GRAND JURY MISCONDUCT

**A.    Background**

Defendants Cavallo and Hornberger ("Defendants") contend that, while testifying before the grand jury that indicted them, a federal agent perjured himself when responding to a grand juror's question. They appeal the district court's denial of their motions[9] to dismiss the indictment based on this alleged misconduct. The pertinent facts are as follows.

During the course of a day-long grand jury session focusing on the present case, an FBI agent testified about the many documents related to the mortgage fraud conspiracy. After he had discussed at length a specific overt act related to a property on 1762 Southpointe Drive, which overt act was also charged as a substantive offense in Count 37, a grand juror asked the agent a question:

---

[8]  Streinz has asserted other errors, including an allegation that the retrieval of his documents at his home was improper. Given our reversal of his conviction on the ground discussed in text, we do not decide any other issues he has raised in this appeal.

[9]  Defendants moved to dismiss the indictment on this ground, both prior to trial and at the close of all the evidence during trial.

GRAND JUROR: On all these – on all these documents that have been signed by these people who are named in the indictment, in each count of the indictment, has it been verified that Bobka, Cavallo, and Hornberger in Count 37 actually signed the documents that they are alleged to have signed?  I mean, their name's been verified that, yeah, that's truly that person's signature and they weren't forged by somebody else?

WITNESS: Right.  Through the investigation, yes sir, we've done that, either through interviews of people, and again, I'll go back, you know, sometimes – many times admissions that they, going right through it, yes, that's my signature.  Yes, that's my signature.  And many times throughout – the total information that we have from witnesses about who the parties were involved, who was at the closing, what was observed and seen in terms of signing.

GRAND JUROR: Okay.

WITNESS: So we've done it through that way.  We – that would be the way that we've done it.

In their motions to dismiss, Defendants argued that, through this response, the agent essentially testified that every signature on every relevant document in this case had been verified as belonging to the purported signer.  This, they argue, was not accurate and thus the agent made a perjurious statement.  In support of this assertion, they cite Hornberger's testimony at trial that a number of signatures on loan documents bearing her name and Cavallo's name were forged by Richard Bobka, who had recruited Hornberger and Cavallo to participate in the scheme and

24

who was substantially involved in the purchase, sale, and management of properties with Hornberger and Cavallo. Additionally, Streinz testified that he did not sign several documents bearing his name related to properties on Commonwealth Drive and Anchorage Drive.

## B.    Discussion

We review a district court's denial of a motion to dismiss an indictment for abuse of discretion but, in determining whether the court abused its discretion, we resolve issues of law *de novo*. *United States v. Schwartz*, 541 F.3d 1331, 1355 n.69 (11th Cir. 2008). Likewise, we review a claim of prosecutorial misconduct *de novo* because it is a mixed question of law and fact. *United States v. Duran*, 596 F.3d 1283, 1299 (11th Cir. 2010).

As a general matter, to establish prosecutorial misconduct for the use of false testimony, a defendant must show that the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony, and that the falsehood was material. *United States v. McNair*, 605 F.3d 1152, 1208 (11th Cir. 2010). When the alleged prosecutorial misconduct occurs in the context of a grand jury proceeding, we dismiss the indictment only when the misconduct "substantially influenced the grand jury's decision to indict" or when there is "grave doubt that the decision to indict was free from the substantial influence of

25

such violations."[10]  *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (internal quotations omitted).  *Accord United States v Verbitskaya*, 406 F.3d 1324, 1336 and n.13 (11th Cir. 2005); *United States v. Vallejo*, 297 F.3d 1154, 1166 (11th Cir. 2002).

As to the elements of perjury, "perjury" is testimony "given with the willful intent to provide false testimony and not as a result of a mistake, confusion, or faulty memory."  *United States v. Ellisor*, 522 F.3d 1255, 1277 n.34 (11th Cir. 2008).  Yet, an agent's inadvertent giving of false testimony before the grand jury does not warrant dismissal of an indictment.  *United States v. DiBernardo*, 775 F.2d 1470, 1475 (11th Cir. 1985).

With the above standards in mind and upon examination of the testimony at issue, we conclude that Defendants have failed to show that the agent's answer to the grand juror's question was untruthful.  Even if one could assume some inaccuracy in the agent's response to the grand juror's imprecisely-worded question, Defendants have failed to demonstrate that the agent intentionally made a false statement, or that the prosecutor would so interpret his testimony.  It is Defendants' thesis that, in response to a spontaneous question by the grand juror,

---

[10]  Prejudice is not required to be shown, however, if the error has so compromised the structural protections of the grand jury "as to render the proceedings fundamentally unfair," in which case there is "a presumption of prejudice."  *Bank of Nova Scotia v. United States*, 487 U.S. 250, 257 (1988).

26

the agent falsely told the grand jurors that investigators had verified that each signature on every pertinent document in the entire case had actually been made by the purported signer. But that is not a fair reading of the question to which the agent was responding. As set out above, the grand juror's question specifically referenced Count 37, which charged Bobka, Cavallo, and Hornberger with making and causing to be made false statements in connection with a loan application submitted in Hornberger's name. As the Government noted in its response to Defendants' pretrial motion to dismiss the indictment, there was ample evidence to indicate that Hornberger had, in fact, signed this document. The Government's contention is borne out by the fact that at trial, the jury found, beyond a reasonable doubt, that Hornberger was guilty of Count 37.

And to the extent that the agent's answer might arguably seem broader than just a reference to Count 37, it is apparent that he was not actually vouching for each signature on every document as, just minutes before this response, the agent had advised the grand jurors that Bobka had, in fact, forged Hornberger's name on other documents. That the agent would thereafter immediately contradict his own testimony and assert that every signature in the case had been verified is implausible, as is the notion that the grand jury would so understand his testimony. In short, Defendants failed to demonstrate that the agent knowingly lied before the

27

grand jury or that the prosecutor would understand the agent to have done so. The district court therefore did not err in denying the motions to dismiss the indictment.

## IV.  ALLEGED EXTRINSIC INFLUENCE ON JURY

Defendants Cavallo and Hornberger[11] argue that their convictions should be reversed because, during deliberations, a juror allegedly went on the internet and learned that a testifying (and cooperating) co-conspirator had received only house arrest based on his conviction. Yet, because Defendants had obtained this information only as a result of Cavallo's violation of a local rule forbidding contact with jurors, the district court struck the evidence that Cavallo offered in support of his allegation of extrinsic influence and denied Defendants' motion for a new trial. In addition, the court concluded that the extrinsic information was not harmful to Defendants. We find no error in the district court's decision.

### A.    Background

At the beginning of the sentencing hearing on October 26, 2012, the prosecutor informed the court that he had just observed Cavallo and Hornberger's counsel, Ms. Unger, speaking with a juror from the trial in the hallway. Unger explained that the juror, Juror George, had approached her in the hallway and asked if they could speak. According to Unger, just as she was telling George that

---

[11] Defendant Streinz likewise raises this claim, but as noted *supra*, we have reversed his conviction on a different ground.

28

she could not talk to jurors, the prosecutor arrived on the scene. After hearing

Unger's explanation, the court addressed Juror George, who was present in the

courtroom, and directed him not to communicate with anyone involved in the case.

George confirmed that he understood the instruction, and the sentencing

proceeded.

On February 20, 2013, which was four months after the sentencing and over

nine months after the jury had returned its verdict, Unger forwarded an email to

prosecutors that she had received from Juror George that day. We summarize this

single-spaced missive.[12] The juror's email begins with compliments for the good

---

[12] The full email reads as follows:

OK, WHERE TO START I HAVE NO IDEA SO I,LL [sic] JUST START TYPING, FIRST OF ALL I THOUGHT YOU DID A GREAT JOB DEFENDING YOUR CLIENTS, FROM THE START I COULD SEE YOU WERE GOING TO HAVE AN UPHILL BATTLE WITH ALL THE MONEY AND RESOURCES THE GOVERNMENT HAS, I WAS GLAD TO SERVE ON THE JURY, AFTER GETTING TO KNOW THE OTHER MEMBERS OF THE JURY I COULD TELL THEY HAD NO IDEA OF HOW THE JUSTICE SYSTEM WORKED. I FEEL SOME AGREED WITH THE GOVERNMENT JUST BECAUSE THEY WERE THE GOVERNMENT, BUT THEY DON,T [sic] REALIZE HOW RUTHLESS THEY CAN BE, FACE IT THEY ARE THERE TO PAINT THE WORST PICTURE OF THE DEFENDANTS AS THEY CAN SO THAT THEY CAN GET A CONVICTION. THE THINGS I,VE [sic] LEARNED SINCE THE TRIAL WAS OVER ONLY WAS AT BEST SHOCKING. I SPOKE TO GEORGE [CAVALLO] TODAY AND I,M [sic] GLAD WE GOT IN TOUCH TO DISCUSS SOME OF THE THINGS THAT TRANSPIRED. ON MY PART I FELT THE DEFENSE YOU WERE TRYING TO GET ACROSS TO US THE JURY WAS THAT RICHARD WAS THE CAUSE OF THERE [sic] DOWNFALL, WHICH I BELIEVE, HE USED HIS BEING A FAMILY MEMBER TO INFLUENCE EVERYONE INVOLVED FOR HIS OWN MONETARY GAIN. ALSO USING HIS FRIENDS TO DO THE SAME. AS FOR THE JURY I HELD OUT ON CONVICTING THEM AS LONG AS I COULD AND KNEW THEY WOULD SOONER OR LATER

job that Unger had done at trial and an observation about the naiveté of fellow

jurors, who purportedly did not know how the justice system works and, in

particular, that prosecutors "can be ruthless" and try "to paint the worst picture of

the defendants."

George then reports to Unger that he has learned some "shocking" things

and, in fact, had just spoken to Cavallo that very day. He notes that he believed

that co-defendant Richard Bobka had been the cause of everyone's "downfall."

---

BEGIN TO NEGOTIATE, I KNEW THE CONSEQUENCES OF BEING CONVICTED WOULD BE DEVISTATING [sic] TO YOUR CLIENTS, AT THE END THERE WAS 2 OF US HOLDING OUT, MY REASON WAS I WASN,T [sic] CONVINCED THE GOVERNMENT PROVED TO ME BEYOND A REASONABLE DOUBT. BUT THEY SURE PUT UP A CONFUSING SMOKESCREEN. NOW HERE GOES THERE WAS A JUROR WHO HELD OUT, REASON BEING SHE BELEF/ED [sic] THAT IF SHE HUNG THE JURY THAT THE GOVERNMENT WOULD NOT RETRY THEM. I TRIED TO CONVINCE HER OTHERWISE BUT IT TOOK A FEW DAYS TO GET HER TO SEE IT MY WAY. I FOUND OUT SHE WAS HOLDING OUT FOR A HUNG JURY, ALSO SHE LOOKED UP THINGS ON INTERNET EVEN THOUGH WE WERE TOLD NOT TO, I FOUND OUT SHE KNEW ONE OF THE DEFENDANTS THAT PLEAD [sic] GUILTY ONLY RECEIVED HOUSE ARREST AND NO JAIL TIME, SO SHE TOUGHT [sic] BY HANGING THE JURY THERE WOULD BE NO RETRIAL, I TOLD HER THAT THE GOVERNMENT WOULDN,T [sic] BACK DOWN AND IF CONVICTED AT ANOTHER TRIAL THE DEFENDANTS WOULD RECEIVE HARSHER SENTENCES. STILL NOT BELEIVING [sic] THAT OTHERS CAME TO ME ABOUT THE SITUATION A [sic] I STATED THAT SOON SOMEONE ELSE WOULD BE FACING JUDGE K, I GUESS THEY CONVINCED HER I WAS SERIOUS, SHE THEN VOTED TO CONVICT ALONG WITH THE REST. I ONLY WANTED TO AGREE TO ONE CHARGE BUT COULDN,T [sic] GET THEM TO ALL AGREE. SORRY, I KNEW THAT CONSPIRACY CHARGE WAS A BAD ONE TO GET BUT THEY INSISTED. PLESE [sic] FEEL FREE TO CONTACT ME IF YOU HAVE ANY QUESTIONS.

30

Further, before finally voting to convict, George, along with another juror, had held out as long as they could, knowing that the "consequences of being convicted would be devistating [sic]" to the defendants.

George explains that he had initially held out because he was not sure that the prosecution had proved its case beyond a reasonable doubt, but instead had only put up a "confusing smokescreen." As to the female juror who had been holding out with him, she was hopeful that if she hung the jury, the Government would not retry the defendants. She was encouraged in this hope, having learned from the internet that one of the testifying co-conspirators who had pled guilty had received only house arrest. But George, who apparently by this time had decided to vote guilty on some counts, argued to this juror that the Government would not back down and that, if convicted, the defendants would receive harsher sentences at a second trial. Eventually, the jury unanimously agreed to convict Defendants on one substantive count each, as well as on the conspiracy count.

George closes the email by expressing his regret that he could not convince his fellow jurors to convict on just one count and also that they insisted on a conviction on the conspiracy count, which he knew was "a bad one to get." Finally, he advises Unger to feel free to contact him with any questions.

31

Upon receiving this email from defense counsel, the Government filed a notice of juror communications with the district court, and Defendants moved for an evidentiary hearing to investigate potential juror misconduct. The court held an organizational meeting with the parties on March 7, 2013 and ordered all future proceedings in the matter to be sealed and all papers to be filed *in camera*. No one objected. The court also ordered the parties to submit questions for the court to ask Juror George, and all parties complied.

On March 28, 2013, the court held the first of two *in camera* hearings. Government counsel, appellate counsel for each defendant, and Juror George and his appointed counsel were present. In response to some preliminary questions by the court, George testified that he had known the court was open to receiving messages from the jury, including during deliberations, and that if there had been a problem, he should have contacted the court, which he did not attempt to do at any point. He further testified that no juror attempted to discuss the case with him; no one provided him with any extrinsic evidence during trial; and he did not personally consult any outside sources or observe any other juror doing so.

Regarding his encounter with defendant Cavallo and Cavallo's attorney, Ms. Unger, immediately before sentencing, George testified that he had introduced himself to Cavallo, and Cavallo had returned his greeting. Then Unger told

32

George that she wanted to talk to him and ask him questions, but they did not have an opportunity to talk further. George testified that although the hallway encounter was the only direct communication he had with Unger, four months later, in February 2013, he received a telephone call from Cavallo "out of the blue." During that call, Cavallo told George that he had obtained George's phone number from a newspaper reporter, Mike Braga, who had covered the trial. Cavallo also explained how devastating the conviction had been for him and his wife, co-defendant Hornberger, noting that the Government was taking their family's home, had "hit [their] bank accounts on Thanksgiving Day," and was "going after everything they have." Cavallo then asked George about the case and the jury's deliberations, and George discussed that with him.

George testified that Cavallo called him multiple times after the initial call. During one of those calls, Cavallo stated that he had spoken with Unger, and that Unger wanted George to email her about the jury deliberations. Cavallo gave Unger's email address to George, and George emailed Unger, as Cavallo requested. Cavallo later called George to confirm that he had sent the email. During one phone call, George asked Cavallo why he had suddenly started receiving phone calls from a reporter named Braga, and Cavallo admitted that he had told Braga everything about the jury deliberations. George told Cavallo he

33

was not comfortable with Braga's involvement and that he "did not want anything published." Finally, George testified that he stood by the verdict rendered at trial.

As noted, Defendants had made no objection when the district judge had announced, at the organizational meeting two weeks prior to the hearing, that she intended to "seal" the proceedings. Instead, they waited until the end of the hearing, to object, for the first time, to the proceedings being sealed and to Defendants themselves not being present. The district court ruled that Defendants had waived any objection to the proceedings being sealed. As to Defendants being present at any future hearing, the court instructed counsel to submit briefs if they wished to be present. Defendants filed no briefs.

On April 9, 2013, the court conducted a follow up *in camera* hearing with the same parties present, and noted that Defendants had waived their objection to being present because they had failed to brief the issue, as directed by the court. As to evidentiary matters handled at this second hearing, Cavallo's counsel offered Cavallo's cell phone records to the court covering the dates on which Cavallo and George had communicated. The phone records reflected fewer communications between Cavallo and George than the latter had recalled in his testimony. These records showed that Cavallo sent one text message to George on February 19, and George sent one text message back that day. On February 20 and 21, George

called Cavallo once, and Cavallo telephoned George twice.  In short, the records revealed five communications between the two men:  none of which had received prior court approval.

After the court reviewed the phone records, the judge again questioned George, and the latter reaffirmed his earlier testimony that when he and Cavallo had spoken on the phone, they discussed the information that he subsequently put in the email to Unger concerning the jury's deliberations.  None of the defendants objected to the questions posed by the court, nor did they request that the court ask additional questions or call additional witnesses.

Their earlier silence notwithstanding, over a week later, on April 19, 2013, Defendants filed an objection to the manner in which the court conducted its inquiry, and they moved to subpoena and question Braga, the news reporter, and the female juror who had allegedly conducted internet research.  Defendants also argued for the first time that the court should have asked George more specific questions about the contents of his email.  Albeit George had offered live testimony concerning his interactions with Unger and defendant Cavallo, the latter merely submitted affidavits containing their versions of their interactions with George.  They made no request or offer to provide live testimony concerning their version of these events.  Moreover, Unger's affidavit was short and bereft of much

35

detail,[13] stating only that her sole exchange with George was on the day of the sentencing hearings, when George exited the elevator and greeted her, and that she neither instructed nor directed anyone to send the email she received from George. Unger never discussed whether she had conferred with Cavallo concerning the latter's plan to contact George and the conversations between the two men.

As to Cavallo's affidavit, he stated that George approached him and Hornberger outside the courtroom at sentencing to introduce himself. Cavallo sensed that George wanted to discuss something important, but they did not have an opportunity to speak further because Government counsel appeared. Cavallo was "haunted" by what George might have wanted to say to him, so "without anyone's advice or encouragement," he looked up George's telephone number on Google, contacted a news reporter to obtain George's email address, and then sent a text message to two of George's telephone numbers on February 19. The next morning, Cavallo received a text message response from George and a phone call from George shortly thereafter. Cavallo stated that when he answered the phone, George, without solicitation, began to excitedly tell him about the things that took place during jury deliberations, including that a juror named Patricia looked up the

---

[13] Oddly, Cavallo argues that the district court should not have criticized Unger's affidavit for being "vague and unsupported" because he, Cavallo, would not waive the attorney-client privilege, thereby freeing up Unger to be more forthcoming. Cavallo does not explain why he would not do so nor offer an explanation why he did not seek to testify to rebut Juror George's testimony. For that reason, it is difficult to understand why he faults the district court for this self-inflicted evidentiary lapse in his case.

36

sentence of Mike Bangasser, who had reportedly received only four months home detention.[14]  Then George asked for Unger's contact information, and Cavallo gave George what he thought was Unger's email address.  George asked Cavallo to call him back to confirm Unger's contact information, which is why Cavallo called George that afternoon.  Cavallo admits that he encouraged George to call, write, or email anyone who might have had an interest in the proceedings but contends that he did not *urge* George to email Unger.  Cavallo learned George had emailed Unger the next morning on February 21, and he called George that day to tell him that they could not speak again.

After hearing and reviewing all this evidence, the district court issued an order in which it credited George's sworn testimony about his encounters with Unger and Cavallo and concluded that the latter had violated the Middle District of Florida local rule restricting parties' and attorneys' contact with jurors, absent court permission.  Indeed, as the court noted, despite Cavallo's tepid efforts in his affidavit to discredit George's testimony, the version of events presented in Cavallo's affidavit actually supported George's testimony that Cavallo contacted

---

[14]  As it turns out, Juror Patricia could not have been referring to co-conspirator Mike Bangasser, who, in fact, received a sentence of fifteen months imprisonment—not home confinement—and who was sentenced six months after the jury returned its verdict in this case. Instead, the parties now appear to agree that the person whom the juror thought had been sentenced to house arrest was, in fact, a testifying co-conspirator named Craig Whitehead who had been charged in a different case, pled guilty, and was sentenced to time served and three months home detention about five weeks before the conclusion of Cavallo's trial.

37

him "out of the blue" to discuss the case.  As a sanction for violating Middle

District of Florida Rule 5.01(d), which prohibits such party-juror communications,

the court excluded George's email against Cavallo and Hornberger, who are

married and who were represented by the same counsel at trial.  The court did not

strike the email against Streinz because neither he nor his counsel were involved in

the rule violation, but it found that any exposure of a juror to the extrinsic

information alleged in the email, if such occurred, was not prejudicial to

Defendants.  Accordingly, the court denied all of Defendants' requests for relief

based on juror misconduct.

## B.    Discussion

Cavallo and Hornberger seek a reversal of their convictions based on the

information about jury deliberations provided by Juror George in Cavallo's

conversations with George.  To the extent that this information was insufficient to

warrant the granting of a new trial, they also contend that the district court should

have conducted a more thorough investigation of the alleged juror misconduct.  We

review the denial of a motion for new trial based on alleged juror misconduct for

an abuse of discretion.  *United States v Venske*, 296 F.3d 1284, 1290 (11th Cir.

2002).  Finding no abuse of discretion, we affirm the district court's denial of

Defendants' motion for a new trial.

38

1. Federal Rule of Evidence 606(b)'s Limitations on Judicial Inquiry
Into Jury Deliberations

"District courts are subject to very stringent limitations on their authority to question jurors about their deliberations," and since 1915 "the Supreme Court has recognized a near-universal and firmly established common-law rule *flatly prohibiting* the use of juror testimony to impeach a verdict." *United States v. Siegelman*, 640 F.3d 1159, 1185 (11th Cir. 2011) (emphasis in original). Absent such a prohibition, "[j]urors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict." *Id*. at 1186 (quoting *McDonald v. Pless*, 238 U.S. 264, 267–68 (1915)). To invalidate an undesirable verdict, allegations of juror misconduct would become commonplace and such scrutiny would discourage "full and frank discussions in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople." *Id*. at 1185 (quoting *Tanner v. United States*, 483 U.S. 107, 120–21 (1987)).

Therefore, in an effort to protect the integrity of the jury system and to forestall endless attacks on a jury's verdict, the Federal Rules of Evidence have codified the common law rule against the admission of a juror's testimony to impeach the jury's verdict. *Id.* at 1186. Rule 606(b) provides:

39

(b)  During an Inquiry Into the Validity of a Verdict or Indictment.

  (1)  Prohibited Testimony or Other Evidence.
During an inquiry into the validity of a verdict . . . a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict . . . .  The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

  (2)  Exceptions.  A juror may testify about whether:
  (A)  extraneous prejudicial information was improperly brought to the jury's attention;
  (B)  an outside influence was improperly brought to bear on any juror; or
  (C)  a mistake was made in entering the verdict on the verdict form.

Fed. R. Evid. 606(b).

In short, except for testimony concerning extraneous prejudicial information or improper outside influence, Rule 606(b)(1) prohibits a juror from providing testimony or other evidence about anything that happened or occurred during deliberations, including a juror's mental processes or the reasons the jury reached a particular verdict.  With only one exception, the information provided by George to Cavallo, and then to Cavallo's attorney, was nothing but a description of the thought process of jury members—and mostly George's own thought process— meaning this information was inadmissible to attack the jury's verdict.  The sole exception was George's disclosure that a juror had learned from the internet that

40

another co-conspirator who had pled guilty had received only house arrest and no jail time.[15]  Because this information was "extraneous," and perhaps prejudicial, Rule 606(b) does not prohibit a juror from testifying about it.  Accordingly, the district court correctly ruled that it was only this last disclosure, to which we now turn, that was subject to scrutiny by the court.

## 2.  Violation of Local Rule 5.01(d) by Defendants

As noted, Rule 606(b) sets out a broad prohibition against questioning jurors about their deliberations or reasons for a particular verdict, with the exception that a juror may testify as to whether extraneous prejudicial information was improperly brought to his attention or outside influence was improperly exerted against him.  There is no allegation of outside influence here, but Defendants have argued that their verdict should be vacated because the jurors received extraneous prejudicial information.  As a general matter, information is deemed to be "'extraneous' if it derives from a source 'external' to the jury.  'External' matters include publicity and information related specifically to the case the jurors are meant to decide . . . ."  *Warger v. Shauers*, 574 U.S. ___, 135 S. Ct. 521, 529 (2014) (internal citations omitted).

---

[15]  This may have been what the juror told George, but in fact Whitehead was sentenced to time served, plus three-months home confinement.  *See supra* at n.14.

The district court, however, found it inappropriate to explore the allegedly "extraneous prejudicial information" that may have found its way to George or the female juror who initially wanted to hang the jury because Cavallo uncovered this information only by brazenly violating a local court rule that flatly forbade the contact that Cavallo made with George.  We agree with the district court.

Middle District of Florida Rule 5.01(d) ("Local Rule 5.01(d)") restricts attorneys' and parties' contacts with jurors absent prior court approval.  The rule provides:

> No attorney or party shall undertake, directly or indirectly, to interview any juror after trial in any civil or criminal case except as permitted by this Rule. If a party believes that grounds for legal challenge to a verdict exist, he may move for an order permitting an interview of a juror or jurors to determine whether the verdict is subject to the challenge. The motion shall be served within fourteen (14) days after rendition of the verdict unless good cause is shown for the failure to make the motion within that time. The motion shall state the name and address of each juror to be interviewed and the grounds for the challenge that the moving party believes may exist. The presiding judge may conduct such hearings, if any, as necessary, and shall enter an order denying the motion or permitting the interview. If the interview is permitted, the Court may prescribe the place, manner, conditions, and scope of the interview.

To translate, neither an attorney nor a party may, directly or indirectly, attempt to interview a juror after trial unless that person first obtains the court's permission to do so.  A motion seeking that permission must be filed within fourteen days after the verdict, absent a showing of good cause for a tardy filing.

42

In addition, the motion must state not only the name of the juror to be interviewed, but also the basis for the request.  In ruling on the motion, the district court is empowered to set limits on the scope or manner of the interview.

Here, the district court concluded that Cavallo and, to some extent, Unger, engaged in conduct that violated this rule.  As to the court's conclusion regarding the conduct of these two, this is a factual finding that we reverse only if clearly erroneous.  *See United States v. Floyd*, 281 F.3d 1346, 1348 (11th Cir. 2002). Further, we accord great deference to a district court's credibility determinations, *United States v. Clay*, 376 F.3d 1296, 1302 (11th Cir. 2004), and we will not reverse a district court's factual finding concerning credibility unless the finding is "contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it."  *United States v. Pineiro*, 389 F.3d 1359, 1366 (11th Cir. 2004) (quotations omitted).

Here, the district court found to be truthful George's testimony that Cavallo contacted George, engaged the latter in conversations about the jury's deliberations, and told him that counsel Unger wanted George to email her with this information.  The court also credited George's testimony that Unger had told George at the time of the sentencing hearing that she would like to ask him

43

questions.  We do not find the district court's conclusions on these matters to be clearly erroneous.

Nor are we persuaded by Defendants' argument that the district court should not have credited George's testimony without first hearing directly from Cavallo and Unger, both of whom chose to file affidavits.  If Cavallo or Unger wanted to testify, they should have asked to do so.  Had Cavallo requested the opportunity to contradict George's testimony with his own testimony, there is no reason to believe that anyone would have tried to stop him.  Moreover, as noted *supra*, Cavallo has explained that he would not waive attorney-client privilege to allow Unger to testify, which suggests that Cavallo had his own reasons to be reticent about testifying on this matter and subjecting himself to cross-examination.  Perhaps most significantly, Cavallo's own affidavit confirms George's testimony that it was Cavallo who initiated contact with George about jury deliberations.

Defendants argue that, even if one accepts as true George's testimony, Cavallo's exchange with George did not violate the local rule, as a legal matter.  Specifically, Defendants argue that Local Rule 5.01(d) prohibits only the "interviewing" of a juror, but that it does not outlaw merely "communicating" with a juror, which they contend is all that Cavallo did.  We give "great deference to a district court's interpretation of its local rules," *Clark v. Hous. Auth. of City of*

44

*Alma*, 971 F.2d 723, 727 (11th Cir. 1992), and we conclude that Cavallo's argument fails to meet the straight-face test. Obviously, the only thing that George and Cavallo had in common was the trial where George served on the jury that found Cavallo guilty. Clearly, Cavallo was not interested in discussing the weather, politics, or sports with George. The jury's deliberations were the only topic that would be of interest to him, and, in fact, it appears to be the only topic that the two men discussed. We find unpersuasive Cavallo's parsing of the Local Rule's description of the conduct that it prohibits, and we concur with the district court's conclusion that Cavallo violated the rule.

Finding no good reason to disturb the district court's determination that Cavallo violated Local Rule 5.01(d), then the next question is whether the court's striking of evidence procured only through Cavallo's violation of the rule constituted a proper sanction for the latter's breach. On this question, our precedent squarely supports the district court's decision. In *United States v. Venske*, 296 F.3d 1284 (11th Cir. 2002), a case which also arose out of the Middle District of Florida, two defendants sought a new trial before the district court, arguing that jurors had been exposed to prejudicial extrinsic information and supporting that contention with an affidavit that the court concluded they had obtained by violating the court's local rule forbidding contact with jurors, absent

45

prior court approval.  Because the defendants had "knowingly and intentionally

engaged in a scheme to defy the [local rule]," the district court excluded the

affidavit and refused to conduct an evidentiary hearing on the allegation.  *Id.* at

1289.

We rejected the defendants' argument challenging the power of a district

court to enact a local rule restricting communications with jurors or to exclude

evidence obtained in violation of such a rule.  *Id.* at 1291.  In affirming the district

court's decision to exclude evidence in the *Venske* case, we explained the strong

policy interests in preventing the type of conduct engaged in by the defendants

there, and by Defendants here.  Those words bear repeating.  As we noted, the

judicial system has a "strong interest in protecting jurors from threats and needless

harassment from unsuccessful parties."  *Id.* at 1291–92.  Another interest is the

need to preserve finality in a jury's verdict.  Because jurors are routinely instructed

that their deliberations are secret and that they will never have to explain their

verdict to anyone, a process that gives losing parties free rein to contact jurors "at

will in an effort to . . . upset the jury's verdict," *id.* at 1292, arguably functions as a

bait-and-switch that undermines the integrity of the court's assurances to the jury.

At bottom, many jurors would "no doubt feel threatened or intimidated" by

interrogation leveled at them by a losing party, and a rule that "effectively deters

46

such contacts . . . preserves the integrity of our judicial process." *Id.* As we concluded in *Venske*, we likewise decide here that, in adjudicating a motion for new trial based on the jury's alleged exposure to extrinsic information, the district court properly struck evidence that was obtained in violation of the local rule restricting communications between a party and jurors.

In addition, the district court did not abuse its discretion in excluding the evidence against Hornberger, as well as Cavallo, even though Hornberger did not personally contact George. The district court concluded that, in sleuthing to uncover secret information about jury deliberations, Cavallo was also acting on behalf of his wife and co-defendant, Paula Hornberger,[16] and had he been successful, Hornberger would have similarly benefited. Moreover, Unger, who purportedly solicited George's email conveying information about the jury's deliberations, was joint trial counsel for both Cavallo and Hornberger.[17] *See*

---

[16] Cavallo also acted on Hornberger's behalf when he asked the court for leniency in setting her sentence. *See* discussion *infra*.

[17] As noted, because Streinz was not involved in the decision to contact George in violation of the local rule, the district court did consider the information contained in George's email as to defendant Streinz, but ultimately decided that the extraneous evidence learned by the female juror did not prejudice him or any of the defendants. The district court noted that, if anything, the extrinsic information was helpful to the defendants. The Government joins in that assessment, noting that the defense had emphasized in closing argument that the co-conspirator-witness was testifying pursuant to a cooperation agreement; had admitted that he was hoping for a reduced sentence; and was therefore motivated to shade his testimony in the Government's direction. Confirmation that this witness had, in fact, received a lenient sentence was helpful to the defense and bolstered its argument. There is resonance to the Government's argument, but as we have reversed Streinz's convictions on another ground, *supra*, we do not need to resolve this question.

47

*Cuevas v. United States*, 317 F.3d 751, 752–53 (7th Cir. 2003) (finding that evidence of juror misconduct was properly excluded where the defendant's family members hired a private investigator to interview jurors in violation of a local rule prohibiting juror-party communication).  In summary, we conclude that the district court did not err in denying a motion for new trial, or further evidentiary hearing, based on Defendants' allegation of extrinsic influence on the jury.

## V.  SUFFICIENCY OF THE EVIDENCE AGAINST CAVALLO

Having made the appropriate motions for a judgment of acquittal at trial, Cavallo likewise argues on appeal that the evidence was insufficient to convict him on Count 28:  the sole substantive count on which he was convicted.  Count 28 charged that, when applying for a loan from Washington Mutual to purchase a home at 3550 Kenmore Drive, Cavallo knowingly made false statements to influence the actions of an FDIC-insured lender, in violation of 18 U.S.C. § 1014. Specifically, the indictment charged that Cavallo falsely claimed that he would use the home as his primary residence and that his monthly income was over $27,000, when in fact his income was much lower and he planned to rent out the home.

To convict Cavallo on this count, the Government was required to prove beyond a reasonable doubt that:  "(1) [he] knowingly made a false statement or report; and (2) he did so for the purpose of influencing the conduct of a federally-

48

insured bank with respect to an application, advance, commitment, or loan." *United States v. Hill*, 643 F.3d 807, 857 (11th Cir. 2011). We review *de novo* sufficiency of the evidence claims, "viewing all the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Taylor*, 480 F.3d 1025, 1026 (11th Cir. 2007). We will affirm a conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Hunt*, 187 F.3d 1269, 1270 (11th Cir. 1999) (internal quotations omitted) (emphasis in original). After reviewing the evidence, we conclude that the Government presented sufficient evidence to prove the above elements as to Count 28.

At trial, Hornberger testified that the Kenmore Drive property was used as a rental property, not as a residence, thereby establishing the first alleged misstatement. As to Cavallo's income being less than $27,000 per month ($324,000 annually), Cavallo and Hornberger's 2005 and 2006 joint income tax returns showed that they earned much less than $100,000 each year. In fact, their 2006 tax return stated that their combined wages were only $23,243, which yielded zero taxable income.

49

Despite the above facts, Cavallo certified several times that all of the information he provided in connection with the loan application was accurate. On February 24, 2006, he signed an Occupancy Misrepresentation and Nondisclosure Affidavit and Agreement, which stated on the first page that "[f]alse swearing may constitute perjury under applicable laws, and misrepresentations in th[e] document [might] constitute fraud." He acknowledged in the affidavit that if a lender issued him a loan, the lender would do so "in reliance upon [his] representations, warranties and agreements stated [t]herein and that [he was making] such representations and warranties in order to induce the Lender to make the Loan." Based on Cavallo's false representations in multiple documents, Washington Mutual Bank loaned Cavallo $256,000 to purchase 3550 Kenmore Drive.

Cavallo argues, however, that proof of the falsity of statements about his income and intended residency are insufficient to prove him guilty because the Government failed to prove that: (1) he personally signed the loan application; (2) he was aware of the loan application's typed misrepresentations relating to income and intent to occupy the home as a primary residence; or (3) given the fact that the application was filled out with a mortgage broker rather than the FDIC-insured Washington Mutual, he willfully influenced an FDIC-insured institution.

50

As to his claim that the Government failed to prove that he signed the pertinent loan documents, Cavallo faults the Government for failing to call a handwriting expert or to prove that he was in the city where the documents were signed on the relevant date.  But the Government was not required to produce a handwriting expert.  *See United States v. Bell*, 833 F.2d 272, 276 (11th Cir. 1987) (finding that a jury is competent to compare signatures and draw its own conclusions); *see also* Fed. R. Evid. 901(b)(3) (recognizing that the trier of fact is competent to compare authenticated samples).  The Government presented numerous documents containing Cavallo's known signature, including two driver's licenses, seven tax returns, and other notarized documents.  Through a comparison of these known signatures to those on the fraudulent documents, there was ample evidence from which the jury could conclude that the signatures on the fraudulent documents belonged to Cavallo.

As to his argument that the Government should have affirmatively shown that he actually read the documents that he signed, Cavallo relies on *United States v. Phillips*, 731 F.3d 649, 656 (7th Cir. 2013) (en banc), which he says held that if a defendant signs a loan document without reading it or knowing its contents, he cannot be held to have adopted the false statements in it pursuant to 18 U.S.C. § 1014.  But Cavallo's reliance on this out-of-circuit case is misplaced.  *Phillips*

51

did not concern a sufficiency of the evidence issue.  Instead, it addressed an evidentiary ruling preventing a defendant from testifying that, when completing a loan application, she relied on a mortgage broker's instruction; this testimony, the Seventh Circuit ruled, should have been allowed because it potentially negated the defendant's "intent to influence." *Id.*  Here, Cavallo did not testify, and no evidence suggested that he failed to read the relevant documents before signing them.  To the contrary, he was an experienced real estate investor who participated in obtaining loans for numerous properties.  From the evidence presented, a reasonable jury could conclude that Cavallo was aware of the contents of the documents he signed.

Finally, because he provided the false information to a mortgage broker, not directly to a covered institution, Cavallo argues that the Government failed to prove that he had acted with the purpose of influencing an FDIC-insured institution.  We have held, however, that to prove that a defendant made a false statement for purposes of influencing a covered institution, the Government does not have to show that the defendant directly presented the document containing the false statement to that institution.  Instead, the Government need only prove that the defendant was on "notice sufficient to create a reasonable expectation that the statement would reach an institution of the type included in the statute." *United*

52

*States v. Greene*, 862 F.2d 1512, 1517 (11th Cir. 1989) (quoting *United States v.*

*Lentz*, 524 F.2d 69, 71 (5th Cir. 1975)).

Obviously, one submits a loan application for the purpose of persuading a

bank to approve and issue a loan. And here Cavallo signed multiple documents

that specifically identified "Washington Mutual Bank, FA" as the "Lender." Thus,

a jury could have found that Cavallo had a reasonable expectation that his loan

application, containing the above-described misrepresentations, would reach

Washington Mutual. Accordingly, we **AFFIRM** Cavallo's conviction on Count

28.

In summary, we reject Cavallo and Hornberger's challenges to the validity

of their convictions,[18] and we affirm those convictions.

## VI. CAVALLO'S APPEAL OF HIS SENTENCE

### A. Background and Standard of Review

Following review of the presentence investigation report (PSR) and a

sentencing hearing, the district court concluded that Cavallo's total offense level

---

[18] Defendants have also argued that the district court erred (1) by failing to hold an evidentiary hearing following Defendants' complaint that FBI agents had intimidated two defense witnesses that Defendants intended to call, and whom they ultimately did call to testify, and (2) by holding sidebar conferences in violation of Defendants' right to a public trial. We find both claims to be without merit.

53

was 34,[19] which, with a criminal history category of I, resulted in a Guidelines range of 151 to 188 months.  The district court granted Cavallo a downward variance and sentenced him to 120-months imprisonment, which variance translates to an approximate two-level reduction.

On appeal, Cavallo argues that the district court incorrectly calculated the amount of loss attributable to him under the Sentencing Guidelines.  As to challenges not involving a calculation of the Guidelines, he contends that the district court impermissibly considered his sex when imposing his sentence and that the court imposed a disparately high sentence, as compared to the sentences of his co-defendants.

We review the reasonableness of a sentence for an abuse of discretion using a two-step process.  *United States v. Cubero*, 754 F.3d 888, 892 (11th Cir. 2014), *cert. denied*, 135 S. Ct. 764 (2014).  We first look to whether the district court committed any significant procedural error, such as miscalculating the advisory Guideline range or  selecting a sentence based on clearly erroneous facts.  *Id.*

---

[19] The PSR reached this calculation by starting with a base offense level of 7 (§ 2B1.1(a)(1));  adding 20 levels for loss exceeding $7,000,000  (§ 2B1.1(b)(1)(K)); adding two levels for making a misrepresentation or other fraudulent action during a bankruptcy proceeding (§ 2B.1.1(b)(9)(B)); adding two levels for use of "sophisticated means" (§ 2B1.1(b)(10)(C)); and finally adding three levels because Cavallo was a manager or supervisor during the conspiracy that involved five or more participants (§ 3B1.1(b)).

Then, we examine whether the sentence is substantively reasonable in light of the totality of the circumstances and the 18 U.S.C. § 3553(a) factors.[20]  *Id.*  The party challenging a sentence has the burden to show that the sentence is unreasonable.  *United States v. Pugh*, 515 F.3d 1179, 1189 (11th Cir. 2008).  We will reverse only if "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case."  *Id.* at 1191 (quotation marks omitted).

After carefully considering the record, we affirm Cavallo's sentence.

## B.    Loss Calculation

The Government bears the burden of establishing the loss attributable to the defendant by a preponderance of the evidence, and we review a district court's determination of monetary loss for clear error.  *United States v. Barrington*, 648 F.3d 1178, 1197 (11th Cir. 2011).  The Sentencing Guidelines do not require a precise determination of loss.  *Id.*  Instead, "[a] sentencing court need only make a reasonable estimate of the loss, given the available information."  *Id.*  Loss is

---

[20]  The § 3553(a) factors include:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to victims.  18 U.S.C. § 3553(a).

calculated as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). "Intended loss" is the pecuniary harm that was intended to result from the offense. *Id.* at cmt. n.3(A)(ii). "Actual loss" is the reasonably foreseeable pecuniary harm that resulted from the offense, which is the correct standard in this case. *Id.* at cmt. n.3(A)(i). The Guidelines acknowledge that a sentencing judge is in a unique position to assess the evidence and estimate the loss, and therefore "the court's loss determination is entitled to appropriate deference." *Id.* at cmt. n.3(C). We address each of Cavallo's loss calculation arguments in turn and find no clear error.

      1.     <u>Consideration of Acquitted Conduct</u>

First, Cavallo complains that the district court included in its loss calculations the loss for properties named in counts on which he was acquitted. As noted, Cavallo was convicted of conspiracy and one substantive count—Count 28—that was related to the 3350 Kenmore Drive property. He was acquitted of all other substantive counts in which he was charged. In calculating relevant conduct for all defendants in the case, the PSR identified twenty-nine properties involved in the fraudulent conduct that lay at the heart of the conspiracy. The PSR held Cavallo accountable for losses attributable to ten of these properties. One of these properties was the subject of Count 28, on which he was convicted; seven

56

properties were named in substantive counts on which he had been acquitted; two others were not included in any substantive counts in which Cavallo was named. All but one of the properties were listed in overt acts in the conspiracy charge. Adding together the loss on each of these ten properties, the PSR calculated the total amount of loss attributable to Cavallo as $7,454,210.74. This loss figure added seven levels to Cavallo's offense level. *See* U.S.S.G. § 2B.1.1.

The methodology in calculating loss was as follows. If the home had been sold, the PSR calculated loss by subtracting the sale price from the loan amount. If the home had not yet been sold, the PSR looked to the market value of the property at the time of sentencing, as set by the Sarasota County Property Appraiser, and subtracted that market value from the loan amount.

In objecting to the loss calculation, Cavallo offered at sentencing a general objection to the inclusion of loss amounts for properties named in counts on which he had been acquitted. In the more specific sentencing memorandum submitted prior to the sentencing hearing, he contended that the Government had failed to prove by a preponderance of the evidence his involvement in relevant fraudulent conduct concerning any property other than the Kenmore Drive property. The district court explicitly adopted the facts contained in the PSR, which established a factual basis for inclusion of all relevant conduct attributed to Cavallo, and

57

accepted the PSR's loss calculation. Moreover, the district judge had done more than just read a presentence report. Having presided over the three-month trial in this case, she was well-equipped to evaluate the evidence.

Cavallo has offered no persuasive argument to undermine a conclusion that the Government proved all the losses attributed to him by at least a preponderance of the evidence. Indeed, he does not try to make such an argument on appeal. Moreover, he acknowledges case authority that permits a judge, in determining relevant conduct, to rely on conduct for which a defendant has been acquitted. In particular, he notes that the Supreme Court has held that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *United States v. Watts*, 519 U.S. 148, 157 (1997). Likewise, this Court has noted that "[u]nder our long-standing precedent, relevant conduct of which a defendant was acquitted [] may be taken into account in sentencing for the offense of conviction, as long as the Government proves the acquitted conduct relied upon by a preponderance of the evidence." *United States v. Faust*, 456 F.3d 1342, 1347 (11th Cir. 2006) (alteration adopted and internal quotations omitted) (quoting *United States v. Barakat*, 130 F.3d 1448, 1452 (11th Cir. 1997)).

Instead of arguing that a preponderance of the evidence did not support the district's court inclusion of these loss amounts, Cavallo argues for the first time on appeal that the district court should have used a clear and convincing standard, not a preponderance of the evidence standard, in calculating loss amount. We review arguments not raised before the district court only for plain error. *United States v. Perez*, 661 F.3d 568, 583 (11th Cir. 2011), *cert. denied*, 132 S. Ct. 1943 (2012). As to the substance of his argument, Cavallo notes that some circuits have required use of a clear and convincing evidence standard before considering acquitted conduct in certain circumstances. He cites *Watts*, in which the Supreme Court recognized a circuit split concerning "whether, in extreme circumstances, relevant conduct that would dramatically increase the sentence must be based on clear and convincing evidence." 519 U.S. at 156.

Yet, our Court has never held that a clear and convincing standard applies to consideration of acquitted conduct. Further, "[i]t is the law of this circuit that . . . there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving [an issue]." *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003). There being no controlling precedent resolving Cavallo's present claim, the district court's error, if any, on the standard of proof is

59

not "obvious" or "clear under current law." *United States v. Humphrey*, 164 F.3d 585, 588 (11th Cir. 1999). Thus, any error is not plain.

We also note the aptness of a plain error standard here. First, as far as we know, the district court may well have concluded that the loss evidence here satisfied not only a preponderance standard, but also a clear and convincing standard. But because Cavallo never raised this as an issue below, the district court was not prompted to articulate whether it was employing a preponderance or a more exacting standard. And had Cavallo raised this issue, the district court would have then been on notice to indicate whether the evidence would have also met the higher standard of proof.

In summary, the district court did not err in considering the above relevant conduct in calculating Cavallo's loss amount.[21]

2.     Ridgewood Lane and Contendo Drive Properties

Cavallo next contends that the district court erred by including in the actual loss calculation two properties on which he was not charged in a substantive count:

---

[21] Cavallo also contends that the district court committed error under *United States v. Booker*, 543 U.S. 220 (2005), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), when it failed to group and calculate Cavallo's offender score for Count 1 separately from his offender score for Count 28. This claim also fails. Cavallo faced a statutory maximum of five years' imprisonment on Count 1 and thirty years' imprisonment on Count 28. *See* 18 U.S.C. §§ 371, 1014. The court sentenced him to serve five years on Count 1 and a concurrent term of ten years on Count 28. Both terms fall within the statutory maximum authorized by the jury's verdict.

60

1516 Ridgewood Lane and 927 Contendo Drive.[22]  Removal of these two

properties from the calculation would be helpful to Cavallo because their inclusion

raised the total loss amount over the $7 million threshold, causing Cavallo's

offender score to increase by two additional levels.  *See* U.S.S.G. § 2B1.1(b)(1)(J),

(K).  Without the inclusion of these two properties, his offense level and

Guidelines range would have decreased to a level 32 and a 121–151 month range,

respectively.

Cavallo contends that he was tied to these properties only as a matter of

"guilt by association."  But Cavallo was convicted of conspiracy to commit wire

fraud, which means that the evidence at trial showed more than mere association,

as a general matter.  As to these specific properties, Richard Bobka, Cavallo's

brother, participated in fraudulent transactions with respect to both properties,

which Cavallo does not dispute.  Cavallo and Bobka operated as partners in their

real estate investments, which included the Contendo and Ridgewood properties.

Cavallo actively took part in managing these two properties through his partnership

with his brother, and the evidence showed that Cavallo, Bobka, and Hornberger

shared a bank account through which they jointly funneled money for the

transactions.  Indeed, Hornberger referred to Bobka as Cavallo's "business

---

[22] Conduct regarding these two properties was included in overt acts in the conspiracy count on which Cavallo was convicted.

61

partner."  Moreover, Cavallo and Hornberger reported ownership of both properties and the expenses incurred in renting out each property on their 2006 and 2007 joint tax returns.  Based on this evidence, the court did not err in attributing the losses stemming from the Ridgewood and Contendo properties to Cavallo as being within the scope of the criminal activity that Cavallo had agreed to undertake.

### 3.    Foreseeability and Timing of Property Valuations

Cavallo also contends that it was not "reasonably foreseeable" to him that lenders, stuck with these properties on whose loans Cavallo and his cohorts had defaulted, would suffer such large losses because he could not have anticipated that the real estate market would take a sharp downturn, thereby causing real estate values to fall.  This is a rather audacious position to take, given that Cavallo's participation in fraudulent activities involving over thirty properties in the Sarasota area contributed to the very economic downturn he claims was unforeseeable.  Moreover, "[u]nlike the application note regarding the *determination* of loss, the application note regarding *credits* against loss does not speak in terms of foreseeability.  The sentencing guidelines, therefore, require foreseeability of the loss of the unpaid principal, but do not require foreseeability with respect to the future value of the collateral." *United States v. Wendlandt*, 714 F.3d 388, 394 (6th

Cir. 2013) (citation omitted) (emphasis in original); *see* U.S.S.G. § 2B1.1 cmt. n.3(A), (E).

Cavallo further argues that he could not have reasonably foreseen losses to the successors in interest of original lenders.  Yet, he signed a host of documents in which he acknowledged that the documents would bind any successors or assigns of the original lenders and that subsequent holders of the notes or mortgages would rely on the truthfulness of his statements.  In short, we find no merit in Cavallo's argument that he could not have foreseen the possibility of large financial losses as a result of his and his co-conspirators' long-term fraudulent activities or the possibility that someone other than the original lender might someday be left holding the bag.

Cavallo's final argument also fails.  He contends that because he withdrew from the conspiracy in August 2007, the district court should have used property values in effect at that time to calculate loss, not property values in effect at the time of sentencing.  Use of the former would have resulted in a lower loss amount because property values in 2007 had not sunk to the depths they had reached by the time of conviction.  Yet, neither the Guidelines nor common sense supports Cavallo's argument.  Guidelines commentary that took effect within one week after Cavallo's sentencing hearing provided that, for purposes of calculating loss of

undisposed collateral, the sentencing court should use the fair market value of that collateral as of the date on which guilt was established, which here would be the date of the guilty verdict. *See* U.S.S.G. § 2B1.1 cmt. n.3(E)(iii) (Nov. 1, 2012).[23] Commentary in effect at the time of Cavallo's sentencing hearing was no more helpful. This earlier iteration provided that the fair market value should be assessed at the time of sentencing. *See* U.S.S.G. § 2B1.1 cmt. n.3(E)(ii) (Nov. 1, 2011). The commentary was amended, in part, to avoid the need for a probation officer to continuously reassess property values in the months leading up to the sentencing date. *See* Amendments to the Sentencing Guidelines, Policy Statements, and Official Commentary at 7 (effective Nov. 1, 2012). Cavallo has not argued that there was a meaningful difference in the values of the property between the date of his conviction, on May 3, 2012, and the date of his sentencing hearing, on October 26, 2012.

Further, the evidence does not support Cavallo's theory that he withdrew from the conspiracy in August 2007. To establish withdrawal, a defendant must

---

[23] [I]n the case of a fraud involving a mortgage loan, if the collateral has not been disposed of by the time of sentencing, use the fair market value of the collateral as of the date on which the guilt of the defendant has been established . . . . In such a case, there shall be a rebuttable presumption that the most recent tax assessment value of the collateral is a reasonable estimate of the fair market value . . . .

U.S.S.G. § 2B1.1 cmt. n.3(E)(iii) (Nov. 1, 2012).

prove: "(1) that he has taken affirmative steps, inconsistent with the objectives of the conspiracy, to disavow or to defeat the objectives of the conspiracy; and (2) that he made a reasonable effort to communicate those acts to his co-conspirators or that he disclosed the scheme to law enforcement authorities." *United States v. Starrett*, 55 F.3d 1525, 1550 (11th Cir. 1995). Cavallo took neither of these steps. He contends that he withdrew from the conspiracy by moving away from Sarasota to Washington and filing for bankruptcy, but that is not enough. *Cf. United States v. Dabbs*, 134 F.3d 1071, 1083 (11th Cir. 1998) (finding that a defendant had not withdrawn from the fraud conspiracy where his "argument rest[ed] solely on his physical distance from, rather than his repudiation of, the actions of his co-conspirators"). Further, the evidence showed that during the bankruptcy proceeding, he and Hornberger hid their involvement with fifteen of the properties obtained during the course of the conspiracy. Finally, that Cavallo may have ceased his day-to-day support of the conspiracy when he moved across the country does not erase his responsibility for losses that resulted from his own prior criminal conduct. Once the fraudulent acts that led to the ultimate losses on these properties were complete, it did not help the victims a whit whether Cavallo chose to stay in town or not. For all these reasons, the district court did not clearly err in making a

65

reasonable estimate of the loss amount for purposes of calculating Cavallo's Guidelines score.

## C.    Non-Guidelines Challenges to Sentence

Cavallo contends that his sentence is substantively unreasonable because it is contrary to 18 U.S.C. § 3553(a)(6), which requires the sentencing court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  We review the reasonableness of a sentence under a deferential abuse of discretion.  *See United States v. Pugh*, 515 F.3d 1179, 1191 (11th Cir. 2008).  The party challenging the sentence has the burden of establishing that the sentence was unreasonable.  *See id.* at 1189.  We may "set aside a sentence only if we determine, after giving a full measure of deference to the sentencing judge, that the sentence imposed truly is unreasonable."  *United States v. Irey*, 612 F.3d 1160, 1191 (11th Cir. 2010) (en banc), *cert. denied*, 131 S. Ct. 1813 (2011).  We determine whether a sentence is substantively reasonable in light of the totality of the circumstances and the § 3553(a) factors.  *Id.*  The district court must impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" listed in § 3553(a)(2), which include the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the

66

offense, to deter criminal conduct, and to protect the public from the defendant's future criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(A)–(C). The sentencing court must also consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the applicable Guideline range, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims. *See* 18 U.S.C. § 3553(a)(1), (3)–(7).

Cavallo argues that because his sentence is harsher than the sentences imposed on many of his co-conspirators, it is non-compliant with one of the factors that a court is supposed to consider in imposing sentence: the need to avoid unwarranted sentencing disparity, as set out in § 3553(a)(6). However, we have stated that "[d]isparity between the sentences imposed on codefendants is generally not an appropriate basis for relief on appeal." *United States v. Regueiro*, 240 F.3d 1321, 1325–26 (11th Cir. 2001). Although *Regueiro* is a pre-*Booker* decision, the circumstances of the present case provide no good reason for us to depart from the above principle.

First, for purposes of § 3553(a)(6), a defendant who cooperates with the Government and pleads guilty is not "similarly situated" to his co-defendant who proceeds to trial. *United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009). Thus, there is no unwarranted disparity even when a cooperating defendant

receives a "substantially shorter" sentence than a defendant who goes to trial. *Id.* Accordingly, only three of Cavallo's co-defendants could be considered "similarly situated" to him: Richard Bobka, Streinz, and Hornberger. Bobka pled guilty four days into trial and received a 180-month sentence, which is higher than Cavallo's 120-month sentence. Streinz received a 60-month sentence, which was the statutory maximum for his sole conspiracy count of conviction. *See* 18 U.S.C. § 371. Finally, while there is a large gap between Cavallo's sentence and that of Hornberger—Cavallo received a ten-year sentence and Hornberger received a one-year sentence—Hornberger's lenient sentence was at the behest of Cavallo, who took full responsibility for Hornberger's involvement and requested mercy for her so that she could care for their minor son. Surely, Cavallo cannot seriously claim now that he wishes the court had imposed a tougher sentence on his wife, just so their two sentences would be more in line. If there is any "unwarranted disparity" between their sentences, it was invited by Cavallo. *See United States v. Brannan*, 562 F.3d 1300, 1306 (11th Cir. 2009) (explaining that it is "common sense [] that where a party invites the trial court to commit error, he cannot later cry foul on appeal"); *see also United States v. Parikh*, 858 F.2d 688, 695 (11th Cir. 1988) (holding that defense counsel invited the court's error when he asked Government witness to relay hearsay).

68

Similarly without merit is Cavallo's contention that the district court impermissibly considered his sex when imposing his sentence:  an issue that he did not raise with the district court, and which we review only for plain error.  *United States v. Bacon*, 598 F.3d 772, 777 (11th Cir. 2010).  An individual's sex is an impermissible factor under the Sentencing Guidelines, U.S.S.G. § 5H1.10, and a sentence "can be unreasonable, regardless of length, if it was substantially affected by the consideration of impermissible factors."  *United States v. Clay*, 483 F.3d 739, 745 (11th Cir. 2007).

The present claim arises out of the district judge's sympathetic response to remarks that Cavallo had made during his allocution, when he took responsibility for his wife's involvement and asked the court to show her mercy.[24]  Later, when she was about to impose sentence, the judge complimented Cavallo on his solicitude for his wife, commenting that Cavallo comes "from the old school" where "the man took the hit so that the lady in his life did not."  This remark, Cavallo argues, suggested that the judge was taking into account his sex in imposing sentence.  We disagree.  Clearly, this sentencing hearing had to be one of the lowest points in Cavallo's life.  The judge's acknowledgment that he had

---

[24]  Cavallo told the court that he took "full responsibility for [Hornberger] and why she's in this courtroom."  He also stated that she "trusted family members.  And that is why she's here. That's the only reason she's in this room.  And she trusted me and I failed her, Your Honor . . . . I failed this woman here . . . .  I don't know what your plan is, but, please, I want my wife to be at home with her son."  Cavallo said he was "owning up" and "taking responsibility" and asked the court to impose a more lenient sentence on Hornberger because their son "needs his mom."

positive character traits, notwithstanding his criminal conduct, was a gesture of kindness, not an act of sex discrimination.  Nothing in the judge's comments suggested that she was sentencing him more harshly because he is a man.  To the contrary, the court granted him a two-level downward variance from his Guidelines range.  In short, the court did not impermissibly consider Cavallo's sex in imposing sentence.

For all the above reasons, we conclude that Cavallo has failed to show that his 120-month sentence is substantively unreasonable.

## VII.  RESTITUTION ORDER

Pursuant to the Mandatory Victims Restitution Act ("MVRA"), persons convicted of certain offenses are required to make full restitution to an identifiable victim who has suffered a direct or proximate pecuniary loss.  *See* 18 U.S.C. § 3663A(a)(1)–(2).  The purpose of restitution "is not [] to provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses."  *United States v. Huff*, 609 F.3d 1240, 1249 (11th Cir. 2010) (internal quotations omitted).  We review the legality of a restitution order *de novo* and the factual findings underlying the restitution order for clear error.  *See United States v. Rodriguez*, 751 F.3d 1244, 1260 (11th Cir. 2014).

70

Hornberger and Cavallo challenge the amount of restitution imposed by the district court.  At sentencing, the district court ordered restitution in the amount of $13,229,100.[25]  This number reflected the face amount of all loans for the ten properties attributed to Defendants.  Unlike the court's loss calculation, the court's restitution computation did not reflect any credits against loss for the proceeds of properties that had been sold or for the current fair market value of properties not yet sold.  Because the loss calculation for Guidelines' purposes did properly factor in those credits, that loss figure was only $7,454,210.74, which was about $6 million less than the amount of restitution imposed.

This is a striking difference, and one we find not to be justified by either the law or the facts of this case.  A restitution award under 18 U.S.C. § 3664 must be based on the loss that a victim actually suffers, and the Government bears the burden of proving that loss.  *See* 18 U.S.C. § 3664(e); *Huff*, 609 F.3d at 1249.  To ensure that a victim is compensated only for its actual loss, the court must deduct, as an offset, any value that the victim may have derived from the fraudulent scheme.  *Huff*, 609 F.3d at 1249.  Otherwise, the victim will receive a windfall, *id.*, as Defendants contend happened here.

---

[25] Actually, the restitution amounts differ slightly between the two defendants, even though the district court indicated that the number should be the same.  The court imposed restitution on Hornberger in the amount of $13,229,100 in both its oral pronouncement and its written judgment.  For Cavallo, the oral pronouncement and the written judgment set his amount of restitution at $13,228,861.74.

71

Proving actual loss for restitution purposes is largely the same as proving actual loss for Guidelines' loss calculation purposes. *See United States v. Futrell*, 209 F.3d 1286, 1290 (11th Cir. 2000) (rejecting argument that Government's burden to prove loss amount under the MVRA "is more exacting than its burden under the Sentencing Guidelines"). And where the loss arises out of a fraudulent mortgage transaction, the Guidelines make clear how one calculates that actual loss. First, if the property that has been pledged as collateral for the loan has been sold, the amount recovered from that sale shall be deducted from the amount of the loan. U.S.S.G. § 2B1.1 cmt. n.3(E)(ii) (Nov. 1, 2011). If the property has not been sold by the time of sentencing, one looks to the most recent tax assessment to determine fair market value,[26] and then subtracts that fair market value from the loan balance. *Id.*

Indeed, in a typical case where a defendant's loss amount under the Guidelines is determined by a calculation of actual loss,[27] the restitution figure

---

[26] Although the Guidelines provide that there is a rebuttable presumption that the most recent tax assessment is a reasonable estimate of the fair market value, a sentencing court may consider factors that rebut the aptness of the tax assessment as a proxy for fair market value. § 2B1.1 cmt. n.3(E)(iii) (Nov. 1, 2012).

[27] However, when intended loss—as opposed to actual loss—is used to calculate the loss amount for Guidelines' purposes, the restitution amount will presumably be less than the Guidelines' loss amount. *See Huff*, 609 F.3d at 1248–49 (noting that a court "could find that a defendant intended a large amount of loss for sentencing purposes, but then order a much-reduced amount in restitution in light of the actual losses suffered by the victims") (quoting *United States v. Allen*, 529 F.3d 390, 396–97 (7th Cir. 2008)). This is so because the Guidelines provide that loss is the greater of intended loss or actual loss. *See* § 2B1.1 cmt. n.3(A)(i)–(ii).

should usually[28] be the same as the loss amount. *Huff*, 609 F.3d at 1247. Yet, although the district court here properly based its Guidelines' calculations on actual loss, it then ordered restitution in an amount exceeding actual loss by approximately $6 million. The district court was aware of this issue. It recognized that the restitution amount did not accurately reflect actual loss, and, apparently for that reason, the written judgment included a statement that "[t]he defendant shall receive credit for any principal paid on loans and credit for any proceeds from sale of property." It is not clear why the court did not go ahead and enter the actual loss numbers that had already been determined at the sentencing. Whatever the reason, the MVRA requires the district court at sentencing, or at a later hearing,[29] to determine the amount of loss suffered by victims. *See* 18 U.S.C. § 3663A(b).

---

So, by definition, if intended loss is the driver of the loss computation, that means it was necessarily greater than the actual loss, and actual loss is the determiner of the amount of restitution.

   [28]   One exception to this general rule could occur when a court concludes that a victim's actual loss includes pre-judgment interest. The Guidelines explicitly exclude "interest of any kind" from the calculation of loss. U.S.S.G. § 2B1.1 cmt. n.3(D)(i). Yet, actual loss for purposes of restitution "may" include pre-judgment interest. *Huff*, 609 F.3d at 1248 n.4 (citing *United States v. Smith*, 944 F.2d 618, 626 (9th Cir. 1991)). Here, the record does not indicate that pre-judgment interest was considered in computing the restitution figure.

   [29]   Pursuant to 18 U.S.C. § 3663(d)(5), where the appropriate amount of restitution is not ascertainable at the time of sentencing, a district court may postpone the determination of restitution for a period not to exceed ninety days. *United States v. Rodriguez*, 751 F.3d 1244, 1260 (11th Cir. 2014).

There is no indication that an amended order has even been issued providing Defendants with the appropriate credits.[30]

Because the restitution amount ordered by the district court does not take into account the value of the collateral properties to the victims, it does not represent the actual loss to the victims, but instead confers a windfall on them. *See Huff*, 609 F.3d at 1249. For that reason, we conclude that the district court clearly erred in its imposition of restitution on Defendants. We reverse and vacate that part of the district court's judgment ordering restitution and remand for the latter to enter a restitution amount that reflects the actual loss to the victims.[31]

## VIII. CONCLUSION

For the reasons stated above, we REVERSE Streinz's conviction and remand for a new trial. We AFFIRM Cavallo and Hornberger's convictions and

---

[30] The Government does not disagree that the restitution amount set out in the judgment greatly exceeds the actual loss suffered by the victims, but it argues that Defendants did not object to the court handling the order of restitution as it did. But when the court first announced that the restitution amount would be over $13 million, counsel for Defendants did point out the court's error: "Excuse me. None of us know where you got that 13 million. We're looking at a 7,450,000 . . . ." The court seemingly acknowledged the correctness of counsel's observation, and said that this would be taken care of in the "body" (presumably, the body of the written judgment). The written order did not, however, incorporate the actual loss figures, but repeated the same raw loan figures, with no appropriate credits to yield an actual loss amount. Defendants are appealing that written judgment.

[31] Defendants have also complained that it is not clear which financial institutions were the appropriate victims for restitution purposes, given the complicated and confusing purchase history regarding some of the original lenders. The district court will be issuing a new restitution order, and we leave to that court the task of sorting out the identities of the victims to be made whole.

sentences, except that we VACATE and REMAND that part of the judgment ordering restitution.

**AFFIRMED in part, REVERSED in part, VACATED and REMANDED in part, with instructions.**