**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 24-12002

Non-Argument Calendar

————————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

WESNER JEAN-PIERRE,

*Defendant-Appellant.*

————————————————

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 3:23-cr-00045-TKW-1

————————————————

Before BRANCH, ABUDU, and ANDERSON, Circuit Judges.

PER CURIAM:

Wesner Jean-Pierre appeals his 26-month sentence for aiding and assisting in the preparation of false income tax returns.  He

makes three arguments on appeal regarding the Sentencing Guidelines.  After careful review, we affirm.

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

In June 2023, a federal grand jury returned an indictment charging Jean-Pierre with 34 counts of aiding and assisting in the preparation of fraudulent tax returns, 26 U.S.C. § 7206(2).  The indictment listed 34 tax returns underlying each count, the taxpayer's initials, the year, and the false items claimed.  Later, Jean-Pierre pled guilty to all counts pursuant to a written plea agreement.  As part of his guilty plea, Jean-Pierre agreed to a statement of facts that, he conceded, the government could prove at trial.  The following facts were part of this stipulation.

Jean-Pierre was a tax preparer who owned a business called WJP Financial Services, LLC ("WJP").  WJP, which had an office in Pensacola, Florida, was staffed by Jean-Pierre and some other employees "who helped file returns on behalf of taxpayers."  Jean-Pierre, who had been preparing tax returns since around 2015, had "the skill and experience to understand what he was doing when filing tax returns," and he had earned a degree at Valencia College, where he took accounting classes.  He also attended annual training seminars on tax preparation through H&R Block and Jackson Hewitt.

Jean-Pierre "routinely prepared fraudulent individual tax returns" for WJP clients by falsely claiming various items—including Schedule C income and expenses, Schedule A itemized deductions, household employee income, Child Tax Credits ("CTC"),

Additional Child Tax Credits ("ACTC"), Federal Tax Paid on Fuels Credits ("FTC"), Earned Income Tax Credits, and American Opportunity Tax Credits—which were added to the returns to increase client refunds. As part of their investigation of Jean-Pierre, law enforcement interviewed WJP clients, who identified Jean-Pierre as their return preparer and confirmed that he had prepared the 34 returns listed in the indictment. Most of these returns were prepared in the presence of the taxpayers, but some were done electronically or by phone. Jean-Pierre collected fees based on his clients' tax refund. Each of the taxpayers interviewed by the officers identified the items on their returns as false and asserted that they had never provided Jean-Pierre with figures or documentation to support those items. Jean-Pierre would "rarely, if ever, go over the tax returns with the taxpayers," and would sometimes send the returns to the taxpayer "with only the first two pages, so [the] taxpayers could not see the false claims." The factual stipulation also provided a chart which described each return and the items on each return which Jean-Pierre falsely reported.

In advance of sentencing, a probation officer prepared a presentence investigation report ("PSI") that detailed Jean-Pierre's offense conduct consistent with the factual proffer. The PSI contained additional relevant facts, as follows.

The government initially investigated Jean-Pierre after becoming aware of "a questionable pattern" of items on 1,949 returns he prepared. The investigation established that Jean-Pierre's own tax returns contained similar suspicious items to those he filed on

behalf of his clients.  The Internal Revenue Service ("IRS") sent an undercover agent to WJP in February 2021, as part of its investigation.  When the agent arrived at WJP, there were only two tax preparers there: Jean-Pierre and an employee named Jalesa Haynes. Haynes prepared a return for the undercover agent which included "a negative amount of more than $8,000" that the agent had not reported or provided documentation to support.  Haynes did not go over the return with the undercover agent.

The investigation also concluded that Jean-Pierre's fee structure was inconsistent and excessive.  Some clients "did not even know how they were charged because Jean-Pierre would not give them a straight answer," while others were charged "several hundred dollars per return," and one client was charged almost $1,000 per return.  These fees "far exceed[ed]" standard rates for the service provided.

Relevant to his argument on appeal, the PSI concluded that Jean-Pierre qualified for an aggravating role adjustment under U.S.S.G. § 3B1.1(c) because there were at least two criminal participants in the scheme—Jean-Pierre and Haynes— and as the owner of WJP, Jean-Pierre managed at least one employee who prepared a false return in his presence.  The PSI noted that Jean-Pierre employed eight individuals but concluded there was not sufficient evidence to conclude the other employees—besides Haynes—were criminal participants in the scheme.  The PSI also noted that the investigation included only 39 of the 1,949 returns prepared at WJP and that Jean-Pierre only used his personal Preparer Tax

Identification Number ("PTIN") for 14 of those 39 returns. Yet the IRS concluded that Jean-Pierre used other return preparers' numbers to prepare the other returns. Still, both Jean-Pierre and other tax preparers at WJP used Jean-Pierre's Electronic Filing Identification Number ("EFIN").

The PSI calculated an estimate of "conservative tax loss caused by Jean Pierre" over the full 1,949 returns, based on tax due and owing from witness interviews. First, it concluded that $142,248 constituted the amount of tax due and owing based on witness interviews. Then it added $6,080 of fraudulent FTC and Education Credits listed on Jean-Pierre's personal tax returns, $244,726 of fraudulent FTC credits added to tax returns using Jean-Pierre's PTIN, and $512,762 of fraudulent FTC credits added to tax returns by other preparers' PTINs where Jean-Pierre's EFIN was used. Based on these figures, the PSI calculated a total loss of $905,816 to the IRS.

The PSI next calculated Jean-Pierre's guidelines imprisonment range. First, it assigned him a base offense level of 20, *see* U.S.S.G. § 2T1.4(a)(1), because he was responsible for more than $550,000, but less than $1,500,000 in loss. It then added two levels, *see* U.S.S.G. § 2T1.4(b)(1)(A) & (B), because Jean-Pierre committed his offenses as part of a scheme from which he derived a substantial portion of his income and because he was in the business of preparing tax returns. Next, it assigned him two more levels because he

was an organizer, leader, manager, or supervisor of the criminal activity, *see* U.S.S.G. § 3B1.1(c).[1]

The PSI then reduced Jean-Pierre's offense level by three, under U.S.S.G § 3E1.1(a) & (b), based on his acceptance of responsibility. It also applied a two-level reduction under U.S.S.G. § 4C1.1(a), because it concluded Jean-Pierre counted as "a Zero-Point Offender" under that provision. Concluding that Jean-Pierre had no adult criminal history, it assigned him a criminal history category of I. *See* U.S.S.G. Ch. 5 Pt. A. The PSI then calculated, based on an offense level of 19 and a criminal history category of I, a guideline imprisonment range of 30 to 37 months. The PSI also noted that the maximum term of imprisonment for each count was three years.

After the initial PSI was prepared, Jean-Pierre filed objections arguing: (i) the proper loss amount was $148,328; (ii) he did not abuse a position of private or public trust; and (iii) the two-level managerial role enhancement should not apply. The government disagreed. A probation officer prepared a revised PSI which made some changes relevant to this appeal. The revised PSI concluded that Jean-Pierre did not meet the criteria to be a "Zero-Point Offender" under U.S.S.G. § 4C1.1(a) because he received the two-

---

[1] Because the PSI assigned Jean-Pierre two levels under U.S.S.G. § 3B1.1(c), it did not apply a two-level enhancement under U.S.S.G. § 3B1.3, which applies when a defendant abuses a position of public or private trust or uses a special skill in a manner that significantly facilitated the commission or concealment of the offense. U.S.S.G. § 2T1.4, comment. (n.4). Still, the PSI noted that this adjustment would also be warranted based on Jean-Pierre's offense conduct.

level managerial role enhancement. Accordingly, the revised PSI calculated Jean-Pierre to have a total offense level of 21. With a total offense level of 21 and a criminal history category of I, the PSI calculated Jean-Pierre's guideline range to be 37 to 46 months' imprisonment.

Jean-Pierre filed a sentencing memorandum advocating for a sentence of probation. He contended that, because of his lack of criminal history, he had a very low risk of recidivism. He also argued that he qualified for the "Zero-Point Offender" reduction under U.S.S.G. § 4C1.1 because, even if he was considered a manager, he had not engaged in a continuing criminal enterprise under 21 U.S.C. § 848. He asked the district court to impose a downward variance even if it disagreed with his argument about § 4C1.1 considering "his otherwise law-abiding life." He also argued that a probationary sentence would allow him to make restitution.

At sentencing, the district court addressed Jean-Pierre's guidelines objections. First, Jean-Pierre again argued that he qualified for a two-level reduction under § 4C1.1(10) because he was not engaged in a continuing criminal enterprise. The court agreed that Jean-Pierre was not engaged in a continuing criminal enterprise, as the term is defined in 21 U.S.C. § 848, but determined that a managerial role adjustment alone would disqualify him from the § 4C1.1(10) reduction, so it overruled the objection as long as the aggravating role adjustment was proper.

As to the managerial role adjustment, Jean-Pierre argued that, although he owned WJP, it was a small enterprise that did not

delineate divisions of responsibility. The government responded that Jean-Pierre's personal ETIN was used on every tax return filed under his business, and many people filed returns on the business's behalf—thus he was clearly managing the business and the people under him. It explained that the PSI had concluded Jean-Pierre's other employees, besides Haynes, were not criminally liable because they were acting on behalf of Jean-Pierre himself, not in furtherance of the scheme.

The court then heard testimony from Special Agent David Tucker, a special agent with the IRS, who testified as follows. Jean-Pierre owned WJP and had at least five employees. Each tax preparing business has an "electronic filing identification number" or "EFIN" that "gives them authorization to file tax returns with the IRS." Then, each employee that prepares tax returns "should have a preparer tax identification number" or a "PTIN." In any event, at WJP, Jean-Pierre and his employees "were using each other's PTIN numbers" so it was impossible to tell who prepared which return. For the individual returns charged in the indictment, the taxpayers identified Jean-Pierre as the one who prepared the return, but different PTIN numbers were used. The owner of an EFIN, however, is responsible for reviewing and approving all tax returns transmitted to the IRS under that EFIN.

During the undercover operation, Haynes prepared the undercover agent's tax return, and Jean-Pierre "was there while it was being done." The tax return had a refund to the undercover agent, including a fuel tax credit and "a false Schedule C." Jean-Pierre

prepared a tax return for another witness that day. Haynes and Jean-Pierre both used a different employee's PTIN to prepare fraudulent tax returns that day, although that employee was not seen in the business.

Agent Tucker then testified about the loss amount calculation. He explained that the calculation consisted of the loss amounts from actual counts of conviction in addition to the loss amount from FTCs. Tucker stated that this was "the most conservative way to come up with the relevant conduct number." Tucker also explained that FTCs are credits for off-highway business use, typically used by construction companies, farmers, and others who have off-road vehicles or equipment that are not registered for on-highway use. Jean-Pierre included FTCs on 69% of the tax returns filed through his EFIN, in contrast to the 2019 national average of .3% and the 2022 national average of 0.4%.

On Jean-Pierre's personal tax return, which was introduced into evidence, Jean-Pierre claimed 2,718 gallons of gasoline for off-highway business use and 1,628 gallons of gasoline used for an inner-city bus "or like vehicle." Agent Tucker explained that, in Jean-Pierre's interview, Jean-Pierre explained that he only owned a Dodge Challenger and thought he could claim FTC credits because he was a business partner in a trucking business, though the trucking business did not qualify for FTC credits because it uses on-highway vehicles. Jean-Pierre also stated that he had not read the instructions for FTCs, and thus he did not understand how to properly use FTCs on tax returns. Based on these answers, Agent

Tucker added all fuel tax credits filed under Jean-Pierre's EFIN into Jean-Pierre's relevant conduct. Moreover, every interview the IRS did with WJP clients confirmed that the FTCs were false, the clients had not discussed the FTC with Jean-Pierre, and they had not provided documentation.

Agent Tucker explained that some of the WJP clients had been audited, some had paid the IRS back, and some had not yet done so. Even so, "for the most part, the money [wa]s gone from the Government because the IRS only has three years to audit somebody after their tax return is submitted," and the three-year limitations period had run. He also explained that, given Jean-Pierre's lack of knowledge on how FTCs worked and the fact his clients had not provided him documentation to support them, no FTC under his EFIN was accurate.

Following this testimony, Jean-Pierre argued the evidence did not show that he directed Hayes as to how to prepare the tax returns, but simply showed that Hayes prepared tax returns while Jean-Pierre was present in the office. He also argued he was not in a position of private trust because he was simply running a business performing a service. The government argued that Jean-Pierre directed Haynes on how to perpetrate the scheme and that he was responsible for every tax return filed, and circumstantial evidence showed that he trained his employees to include fraudulent credits.

The court found that the managerial enhancement applied, stating, "I heard sufficient evidence that [Jean-Pierre was] in charge of this organization and, thus, responsible for all the returns that

are prepared under his employer number." It concluded "the fact that the evidence showed that they were passing each other's PTINs . . . around suggests to me that he at least allowed that to happen and, thus, allowed this activity to go on." It also determined that Jean-Pierre was in a position of trust, so "he would qualify for both [enhancements], but because the way the guidelines work, you can only get one of the" two enhancements. It concluded: "I think the guideline appropriately gives him the role adjustment. But, again, if I'm wrong about that and he should not have gotten the role adjustment, then he would have gotten the same plus-two for the position of trust."

As to the loss amount calculation, Jean-Pierre argued the FTC amounts were not verified by interview, and the IRS incorrectly assumed that all FTCs added using his PTIN and EFIN were fraudulent. The government responded that every tax return that Agent Tucker reviewed with an FTC was fraudulent, and thus the court could infer based on the national averages, the reviewed tax returns, and the witness statements that every FTC applied by Jean-Pierre was false. It asserted that the total loss amount would have been much higher had it been based on every false item on every tax amount. The court overruled this objection as well, explaining: "the loss is probably greater than that because the other potentially fraudulent credits were not even looked into beyond the interviews that were conducted. And so I suspect there was a larger loss out there that just isn't captured in the amount that's shown."

Having resolved the outstanding objections, the district court concluded that Jean-Pierre had a total offense level of 21 and a criminal history category of I, resulting in a guideline range of 37 to 46 months. *See* U.S.S.G. Ch. 5 Pt. A. However, it added that the maximum penalty on each count was 36 months' imprisonment. The government asked for a guidelines sentence, noting the number of false tax returns and the effect of Jean-Pierre's crime on WJP clients who trusted Jean-Pierre to prepare their tax returns. Jean-Pierre again argued for a probationary sentence.

The court noted that Jean-Pierre's otherwise "very law-abiding" life, strong work history, and strong work ethic "cut[] in his favor." It balanced this against the "significant" nature and circumstances of the offense of tax fraud—for which, in addition to the identifiable victims, "the entire public is a victim." It opined that it needed to send a message to others in Jean-Pierre's position that crime does not pay, but also needed to balance the need for Jean-Pierre to pay his restitution. Accordingly, it granted Jean-Pierre a downward variance and imposed a sentence of 26-months' imprisonment on each count, to run concurrently, to be followed by a 1-year term of supervised release.

The district court entered judgment consistent with its statements at sentencing, and Jean-Pierre appealed. After his notice of appeal, the parties agreed to a total restitution amount of $830,840, and the district court entered an order to this effect. Jean-Pierre did not appeal his restitution.

## II. STANDARDS OF REVIEW

"When the government seeks to apply an enhancement under the Sentencing Guidelines over a defendant's factual objection, it has the burden of introducing 'sufficient and reliable' evidence to prove the necessary facts by a preponderance of the evidence." *United States v. Washington*, 714 F.3d 1358, 1361 (11th Cir. 2013) (quoting *United States v. Perez-Oliveros*, 479 F.3d 779, 783 (11th Cir. 2007)).  On appeal, the imposition of an aggravating role enhancement and the amount of loss attributable to the defendant are factual findings that we review for clear error.  *United States v. Shabazz*, 887 F.3d 1204, 1222 (11th Cir. 2018); *United States v. Cavallo*, 790 F.3d 1202, 1232 (11th Cir. 2015).  To be clearly erroneous, the finding of the district court must leave us with a "definite and firm conviction that a mistake has been committed."  *United States v. Isaac*, 987 F.3d 980, 990 (11th Cir. 2021) (quoting *United States v. Rothenberg*, 610 F.3d 621, 624 (11th Cir. 2010)).  Clear error is a very deferential standard.  *See, e.g.*, *OHI Asset (VA) Martinsville SNF, LLC v. Wagner (In re Wagner)*, 115 F.4th 1296, 1303 (11th Cir. 2024).  Accordingly, where a factfinder can have multiple permissible views of the evidence, the factfinder's choice between those permissible views does not amount to clear error.  *See id.*

A district court may base its factual findings on facts admitted in the defendant's guilty plea, undisputed statements in the presentence investigation report ("PSI"), or evidence presented at the sentencing hearing.  *United States v. Matthews*, 3 F.4th 1286, 1289 (11th Cir. 2021).  "The court may also make reasonable inferences from the evidence."  *Id.*; *see also United States v. Philidor*, 717 F.3d

883, 885 (11th Cir. 2013) (explaining that, at sentencing, a court can make inferences, "based on common sense and ordinary human experience"); *United States v. Chavez*, 584 F.3d 1354, 1367 (11th Cir. 2009) (explaining that a district court may rely on "reasonable inference[s]," but not ones that are "speculative to the point of being clearly erroneous"). Still, a "district court 'may not speculate about the existence of a fact that would result in a higher sentence.'" *United States v. Baldwin*, 774 F.3d 711, 727 (11th Cir. 2014) (quoting *United States v. Barrington*, 648 F.3d 1178, 1197 (11th Cir. 2011)).

When a party raises a constitutional issue for the first time on appeal, we review only for plain error. *United States v. Harris*, 741 F.3d 1245, 1248 (11th Cir. 2014); *see also United States v. Utsick*, 45 F.4th 1325, 1332 (11th Cir. 2022) (laying out the elements of plain-error review).

## III. DISCUSSION

As we noted above, Jean-Pierre makes three arguments on appeal, each relating to the district court's application of the Sentencing Guidelines. We address each argument in turn.

### A. The District Court did not err in applying U.S.S.G. § 3B1.1(c)'s Managerial Enhancement.

Jean-Pierre first argues that the district court erred in imposing the managerial role enhancement because the government did not meet its burden to show that his subordinates knew they were violating the tax code and willfully broke the law. He contends that his subordinates at WJP were merely employees who made "technical mistakes at work without knowledge of the tax code

requirements." He also contends that Haynes was only observed making errors once and there was not sufficient evidence to show that her mistakes were willful. Jean-Pierre also argues that this issue "implicates his due-process right to a sentence grounded in facts, not speculation," so we should review it under "the preserved constitutional-error standard." He contends that this error harmed him, despite the district court's downward variance, because the sentencing guidelines informed the court's downward variance.

Whether we view Jean-Pierre's argument through the lens of due process or as a challenge to the application of the sentencing guidelines, we apply clear error review to the factual question of whether the managerial enhancement was properly applied. *Shabazz*, 887 F.3d at 1222; *see Chavez*, 584 F.3d at 1367 (explaining "speculative" inferences are improper when they are "clearly erroneous"); *cf. United States v. Ghertler*, 605 F.3d 1256, 1269 (11th Cir. 2010) (explaining that a defendant's due process rights are violated when, *inter alia*, "challenged evidence is materially false or unreliable"). In other words, if the district court's findings were not clearly erroneous, his due process challenge fails, because the findings were also not impermissibly speculative.[2]

Under § 3B1.1(c), a defendant receives a two-level increase in his offense level if he was "an organizer, leader, manager, or supervisor in any criminal activity" involving fewer than five

---

[2] We also note that Jean-Pierre did not raise any due process challenge at sentencing, so to the extent that his challenge presents that issue, it would be reviewed only for plain error. *See Harris*, 741 F.3d at 1248.

participants.  U.S.S.G. § 3B1.1(c).  Whether the enhancement applies depends on several factors, including:

> (1) the exercise of decision making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others.

*United States v. Dixon*, 901 F.3d 1322, 1348 (11th Cir. 2018) (alteration adopted) (quoting *United States v. Martinez*, 584 F.3d 1022, 1026 (11th Cir. 2009)).  A defendant need not meet each consideration to qualify, and instead, the government need only show that "evidence that the defendant exerted some control, influence or decision-making authority over another participant in the criminal activity."  *Id.* (quoting *Martinez*, 584 F.3d at 1026); *see also* U.S.S.G. § 3B1.1, comment. (n.2).

"A 'participant' under § 3B1.1 is 'a person who is criminally responsible for the commission of the offense, but need not have been convicted.'"  *United States v. Zitron*, 810 F.3d 1253, 1261 (11th Cir. 2016) (quoting U.S.S.G. § 3B1.1, comment. (n.1)).  In assessing whether a person was "criminally responsible," we may consider any of the person's acts directed or influenced by the defendant that constituted relevant conduct.  *Id.* at 1261–62.  When a defendant is convicted of filing false tax returns, in determining whether a person was a participant under Section 3B1.1 "it makes no difference

that [the person] did not actually help [the defendant] file the false returns—it is enough that they knowingly assisted in some way in [the defendant's] criminal tax scheme." *Id.* at 1256–57, 1262.

On this record, we do not find clear error. As the owner of the business, Jean-Pierre necessarily exerted some level of control, influence, or decision-making over his employees. *Dixon*, 901 F.3d at 1348. This is both proven by the circumstantial evidence presented at the sentencing hearing—which showed that Jean-Pierre was responsible for every return submitted under his EFIN and was present when Haynes prepared the undercover agent's fraudulent tax return—and by the reasonable inferences that the district court drew from that evidence. *Philidor*, 717 F.3d at 885; *Chavez*, 584 F.3d at 1367. The district court also found significant the fact that the employees were using each other's PTINs, suggesting that Jean-Pierre "allowed that to happen."

On appeal, Jean-Pierre focuses on the lack of direct evidence that Haynes had the requisite criminal *mens rea* and contends that because the government did not prove she was criminally responsible, the enhancement should not apply. U.S.S.G. § 3B1.1, comment. (n.1). Although the evidence supporting the enhancement would have been even stronger if, for example, Haynes had testified that she knew she was engaging in the scheme, *Zitron*, 810 F.3d at 1261, "in common experience[,] circumstantial evidence is most likely to be the only evidence of a subjective state of mind," *United*

*States v. Smith*, 548 F.2d 545, 549–50 (5th Cir. 1977)[3] (quoting *United States v. Wetzel*, 514 F.2d 175, 177 (8th Cir. 1975)).[4]  Here, the circumstantial evidence showed that, in Jean-Pierre's presence, Haynes prepared a false tax return for an undercover agent that included various items that were unsupported by the evidence presented by the agent to generate a negative amount of over $8,000, and then did not review that return with the agent.  This was sufficient to suggest that Haynes had the requisite criminal *mens rea*.  Haynes's actions mirrored Jean-Pierre's broader scheme and were wholly inconsistent with the role of a tax preparer in common understanding.  The district court did not commit clear error or engage in unwarranted speculation to assume that Haynes "knowingly assisted *in some way* in [Jean-Pierre's] criminal tax scheme." *Zitron*, 810 F.3d at 1256–57, 1262 (emphasis added).  Accordingly, we affirm on this issue.

### B. *The District Court did not err in denying Jean-Pierre a "Zero Point Reduction" under U.S.S.G. § 4C1.1.*

In November 2023, Amendment 821 to the Sentencing Guidelines went into effect.  *See* U.S. Sent'g Comm'n, *Adopted Amendments (Effective November 1, 2023)*, Amend. 821 ("Amendment

---

[3] All Fifth Circuit decisions issued by the close of business on September 30, 1981, are binding precedent in this Court.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

[4] Indeed, as we recently explained in a case regarding currency transaction reporting, in financial crimes requiring willfulness, a "jury almost always must infer *mens rea* . . . . from irregular patterns . . . and related context." *United States v. Zayas*, 141 F.4th 1217, 1228 (11th Cir. 2025).

821"). Relevant here, Amendment 821 added a new section, U.S.S.G. § 4C1.1 (2023), which provided for a decrease in a defendant's offense level with the satisfaction of ten criteria. *Id.* Specifically, the defendant must not have: (1) received any criminal history points under Chapter Four, pt. A; (2) received an adjustment under U.S.S.G. § 3A1.4; (3) used violence or credible threats of violence in connection with the offense; (4) caused death or serious bodily injury; (5) committed a sex offense; (6) personally caused substantial financial hardship; (7) possessed, received, purchased, transported, transferred, sold, or disposed of a firearm or dangerous weapon; (8) committed an offense under U.S.S.G. § 2H1.1; (9) received an adjustment under U.S.S.G. § 3A1.1; or (10) received an adjustment under U.S.S.G. § 3B1.1 and not have engaged in a continuing criminal enterprise. U.S.S.G. § 4C1.1(a) (2023).[5]

Here, the district court did not err in denying Jean-Pierre a reduction under § 4C1.1 because Jean-Pierre received an

---

[5] In 2024, the Sentencing Commission amended U.S.S.G. § 4C1.1(a) "by striking paragraph (10) as follows: '(10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848;'; and by inserting at the end the following new paragraphs (10) and (11): '(10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role); and (11) the defendant was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848.'" *See* U.S. Sent'g Comm'n, *Adopted Amendments (Effective November 1, 2024),* Amend. 831. In doing so, the Commission clarified that it "intended § 4C1.1(a)(10)" to make "defendants . . .ineligible . . . if they either have an aggravating role or engaged in a continuing criminal enterprise," rather than only if they have both, and the amendment clarified that point. *Id.*

aggravating role enhancement under § 3B1.1 and was thus ineligible.  *See* U.S.S.G. § 4C1.1(a)(10) (2023).  We affirm as to this issue.

### C. The District Court did not clearly err in determining the loss amount.

In his final argument, Jean-Pierre contends that the district court erred in calculating the loss to the IRS for purposes of the Guidelines.  He contends that the district court's "computation was error for five independent reasons."  First, he contends that the district court improperly relied on losses which were not proven to be willful.  Second, he argues the district court's conclusion that all 1,344 FTC claims were incorrect was based on "speculation" because there were only 12 confirmed false FTCs.  Third, he argues that the government's reference to the national average for FTCs was unreliable because the government did not establish the makeup of WJP's clientele—in other words, the government did not establish that WJP clients are eligible for FTCs at the national rate.  Fourth, "there was no breakdown of which FTCs were filed with [Jean-Pierre's] personal involvement.  This argument relies on his prior argument that "generally, [his] subordinates were criminally innocent."  Fifth, he contends that the testimony of Agent Tucker was not "reliable and specific" because Tucker did not explain how he came to the sum of the FTCs.  Jean-Pierre also argues that this issue implicates his due process rights.[6]

---

[6] Again, however, Jean-Pierre did not raise a due process challenge before the district court, so this aspect of his argument is only reviewed for plain error.

As noted above, we review the district court's determination of the loss amount for clear error. *Cavallo*, 790 F.3d at 1232. The Guidelines do not require that the sentencing court make "a precise determination of loss." *Id.* Instead, "'a sentencing court need only make a reasonable estimate of the loss, given the available information.'" *Id.* (alteration adopted, quoting U.S.S.G. § 2C1.1, comment. n.3(A)). The Guidelines explain that, in tax cases, "tax loss shall be treated as equal to 28% of the unreported gross income (34% if the taxpayer is a corporation) plus 100% of any false credits claimed against tax, unless a more accurate determination of the tax loss can be made." U.S.S.G. § 2T1.1(c)(1)(A).

All relevant conduct may be considered in determining the loss amount, as long as the government can prove the conduct by a preponderance of the evidence. *Cavallo*, 790 F.3d at 1233–34. We concluded a district court erred when it made no specific factual findings on which to base the loss amount and instead stated that it just "pick[ed] a figure, like any jury would, about halfway between" the parties' loss estimates of $0 and $3.4 million. *United States v. Gupta*, 572 F.3d 878, 888–89 (11th Cir. 2009). Still, failing to make specific factual findings as to loss amount "will not result in reversal 'if the record otherwise supports the court's determinations.'" *United States v. Maitre*, 898 F.3d 1151, 1160 (11th Cir. 2018) (alteration adopted) (quoting *Baldwin*, 774 F.3d at 727).

---

*See Harris*, 741 F.3d at 1248. In any event, we need not address that issue in depth because Jean-Pierre has not shown error.

To begin, we note that the district court's loss calculation began from a conservative point. Agent Tucker explained that—even though many of the fraudulent returns charged in the indictment had numerous false items—the loss was based only on FTCs. This was because the FTCs are rare, all WJP clients who were interviewed said that the FTCs were improperly applied, and Jean-Pierre improperly used FTCs himself on his own tax return. Moreover, Jean-Pierre pled guilty to willfully committing 34 counts of aiding and assisting in the preparation of false tax returns and of the 39 returns the government evaluated, 33 had false FTC returns. His factual proffer also stated that he "routinely prepared fraudulent individual tax returns" that contained FTC credits. Accordingly, Agent Tucker added all the FTCs used on Jean-Pierre's ETIN and PTIN, the FTCs on Jean-Pierre's personal tax returns, and the amount it had discovered from witness interviews.[7] Moreover, Jean-Pierre does not dispute the inclusion of the tax due from witness interviews or the fraudulent FTC and education credits listed on his own personal tax returns—he only challenges the inclusion of the FTCs added to tax returns using his PTIN and EFIN.

Given the evidence we have summarized, the district court did not clearly err in concluding that Jean-Pierre's use of FTCs was fraudulent and willful on all the returns used in the loss calculation.

_____

[7] We reject Jean-Pierre's assertion that Agent Tucker's testimony was not reliable and specific enough. Agent Tucker's testimony was clear on where the figures came from and was consistent with the numbers previously provided in the PSI.

Indeed, faced with this evidence, a reasonable inference is that *all* FTCs added to tax returns using Jean-Pierre's PTIN and EFIN were false because Jean-Pierre admitted that he had not read the rules for applying FTCs, WJP applied them at a rate exponentially higher than the national average, and WJP clients who were interviewed stated that they had not provided documentation for the FTCs that he applied. *Matthews*, 3 F.4th at 1289; *Philidor*, 717 F.3d at 885. Moreover, the district court permissibly concluded that Jean-Pierre was in charge of WJP and generally responsible for the filings on his ETIN, so Jean-Pierre's argument that the court failed to break down which FTCs were filed with his personal involvement is misplaced. *Philidor*, 717 F.3d at 885.

Of course, under some circumstances, an extrapolation from a subset of data might be too speculative or unsupported. *See United States v. Annamalai*, 939 F.3d 1216, 1238 (11th Cir. 2019); *cf. United States v. Mehta*, 594 F.3d 277, 283 (4th Cir. 2010). Additionally, in some cases a district court might not adequately resolve the parties' dispute about the correct loss amount. *See Gupta*, 572 F.3d at 888–89. However, we have explained that such a situation is not present here. Instead, Jean-Pierre simply disagrees with the district court view of the evidence. Yet a factfinder's choice between permissible views of the evidence is not clear error. *Wagner*, 115 F.4th at 1303; *see also United States v. Esformes*, 60 F.4th 621, 638 (11th Cir. 2023) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it . . . ." (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985))). Because the loss amount

was a permissible view of the evidence, we affirm as to this issue as well.

## IV. CONCLUSION

For the reasons we have explained, we find no reversible error in any of the rulings of the district court. Accordingly, we affirm Jean-Pierre's sentence.

**AFFIRMED.**